# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Rexam Inc.,

      Plaintiff,

      v.

United Steel Workers of America,
AFL-CIO-CLC; International Association
of Machinists and Aerospace Workers;
United Steel Workers of America,
AFL-CIO-CLC, Local 0188S; and
Waldo W. Slagerman; Marlene A.
Rudolph; Steven J. Stolarski; Frank
Kieswether; Larry Alford; George A.
Kneifel; Gail J. Rearick; Dwayne L.
Wilson; and Lloyd W. Erickson,
Individually, and as Representatives of
Persons Similarly Situated,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 03-2998 ADM/JJG

---

James P. McLoughlin, Jr., Esq., Alton L. Gwaltney, III, Esq., and Mark A. Nebrig, Esq., Moore & Van Allen, Charlotte, NC; and Timothy E. Branson, Esq., Dorsey & Whitney LLP, Minneapolis, MN; and Frank Brown, Esq., Rexam, Inc., Charlotte, NC, argued on behalf of Plaintiff.

Stephen M. Pincus, Esq., Stember Feinstein Krakoff, Pittsburgh, PA; and William T. Payne, Esq., Payne Law Office, Pittsburgh, PA, argued for United Steel Workers of America, AFL-CIO-CLC, United Steel Workers of America, AFL-CIO-CLC, Local 0188S, Waldo W. Slagerman, Marlene A. Rudolph, Steven J. Stolarski, Frank Kieswether, Larry Alford, George A. Kneifel, Gail J. Rearick and Dwayne L. Wilson.

Sally M. Tedrow, Esq. and Francis J. Martorana, Esq., O'Donoghue & O'Donoghue LLP, Washington DC; and Ronald Marks, Esq., Peterson, Engberg & Peterson, Minneapolis, MN, argued for International Association of Machinists and Aerospace Workers and Lloyd W. Erickson.

---

## I.  INTRODUCTION

On November 21, 2005, oral argument before the undersigned United States District

Judge was heard on: 1) Rexam Inc.'s ("Rexam") Motion for Summary Judgment against

Defendants International Association of Machinists ("IAM")[1] [Docket No. 138], 2) Rexam's

Motion for Summary Judgment against Defendants United Steel Workers of America, AFL-CIO-

CLC and United Steel Workers of America, AFL-CIO-CLC, Local 0188S, Waldo W. Slagerman,

Marlene A. Rudolph, Steven J. Stolarski, Frank Kieswether, Larry Alford, George A. Kneifel,

Gail J. Rearick, and Dwayne L. Wilson (collectively, "USWA") [Docket No. 193], 3) IAM's

Motion for Summary Judgment [Docket No. 182], and 4) Joint Defendants' Renewed Motion to

Exclude Expert Testimony of Mark Johnson and Ronald Seeber [Docket No. 186].  For the

reasons set forth herein, all four motions are denied.

## II.  BACKGROUND

A brief recitation of the relevant factual background applicable to this Order will suffice

as additional facts and procedural history are set forth in the Court's previous Orders [Docket

Nos. 42, 119, and 201] and are incorporated by reference.  This case stems from Rexam's

request for a declaratory judgment determining that Rexam has the legal right to unilaterally

modify or terminate benefits provided to its retired employees pursuant to collective bargaining

agreements ("CBAs") and Employee Retirement Income Security Act ("ERISA") plan

documents.  Am. Compl. [Docket No. 3].  Rexam is a large aluminum beverage can

manufacturer that employs members of both USWA and IAM.  In 2000, Rexam acquired

---

[1] Rexam is not moving for summary judgment against Lloyd W. Erickson, the only IAM retiree who is a party to this litigation.  The retiree plan covering Erickson was negotiated by an IAM affiliate and not by IAM.

American National Can ("ANC"),[2] which was created by the 1987 merger of two major can

manufacturing companies, American Can Company ("ACC") and National Can Company

("NCC").  Rexam App. Against IAM 18 at 6, 24-25, 31.  As a result, Rexam assumed

responsibility for providing retiree welfare benefits to individuals who retired under CBAs

between the unions and Rexam's predecessors.

ACC negotiated separate CBAs, each known as the Basic Agreement ("Basic CBA"),

with IAM and USWA.  Rexam App. Against IAM 19 at 256.  NCC negotiated separate CBAs,

each known as the Master Agreement ("Master CBA"), with USWA.[3]  After ACC and NCC

merged, ANC continued to negotiate Basic CBAs that covered former ACC employees and

Master CBAs that covered most former NCC employees.  See Rexam App. Against IAM 19 at

256-57.  Rexam continued the practice after acquiring ANC.

USWA and IAM retirees have received welfare benefits pursuant to Basic and Master

CBAs and separate plan booklets since 1959.[4]  After ACC and NCC merged, ANC maintained

the following separate benefits plans for its retirees, depending on the company they formerly

worked for and the union they were a member of: 1) most former NCC employees and USWA

members were covered by the Retired Employees; Group Life Insurance and Health Care Plan

---

[2] Prior to Rexam's acquisition of ANC, ANC was briefly owned by Pechiney.  Rexam App. Against IAM [Docket No. 142] 18 at 26-27.

[3] Some employees were covered by Independent Agreements ("Independent CBAs"), negotiated separately by the local affiliate of IAM or USWA, such as all individuals that were both NCC employees and IAM members prior to 2000, and USWA members that were employed at the Valparaiso and Whitehouse plants.  Rexam App. Against IAM 16 at 73; Rexam App. Against USWA [Docket No. 196] 21 at 21.

[4] Valparaiso retirees first began receiving welfare benefits in 1984.  Whitehouse retirees began receiving benefits in 1989.  Rexam Br. Against USWA [Docket No. 195] at 5, n.13.

("Buff Book"), 2) former ACC employees and USWA members were covered by the Group

Insurance Plan for Retired USW Employees ("Red Book"); and 3) former ACC employees and

IAM members were covered by the American National Can Company Group Insurance Plan for

Retired IAM Employees ("White Book").  Rexam App. Against IAM 10; Rexam App. Against

USWA 6, 7.  In 1994, ANC, endeavoring to have all of its retirees covered under the same

benefits plan, unilaterally implemented the American National Can Company Group Benefit

Plan for Retired Union Employees ("Plan 583").[5]  Rexam App. Against IAM 11; Rexam App.

Against USWA 8.  The Buff Book, the White Book, and the Red Book became Summary Plan

Descriptions ("SPDs") for Plan 583.  Rexam App. Against IAM 14 at 182; Rexam App. Against

USWA 17 at 182.  Rexam[6] inherited Plan 583 from ANC, and maintains that Plan 583 is the plan

that currently applies to all of its retirees.

### III. DISCUSSION

A.      **Standard for Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

---

[5] Also in 1994, ANC sent its retirees a notice regarding the new prescription drug program known as "Healthy Options."  Rexam App. Against IAM 12; Rexam App. Against USWA 9.

[6] "Rexam" will henceforth refer collectively to both Rexam and its predecessors in interest.

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party

may not "rest on mere allegations or denials, but must demonstrate on the record the existence of

specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953,

957 (8th Cir. 1995).

B.      **Arbitration**

        IAM moves for summary judgment on its counterclaim to compel arbitration.[7]  IAM

argues that the Court must determine whether retiree benefits "vested,"[8] in the sense that the

benefits were earned or accumulated over time.  If the benefits "vested," then the Court must

submit this dispute to arbitration, in accordance with the presumption of arbitrability, because

the right to benefits arose under prior CBAs including broad arbitration clauses, in which the

parties expressly agreed to submit disputes about the CBAs, or between IAM and the Company,

to arbitration.  IAM insists that they have not waived their right to arbitration by acting

inconsistently with that right or by prejudicing Rexam by their acts.

        Rexam responds that summary judgment on IAM's counterclaim should be denied on

several grounds, including: 1) IAM has waived the right to arbitration by its inconsistent actions

that have prejudiced Rexam, 2) IAM's arbitration motion is non-dispositive and therefore

untimely, 3) there is no presumption of arbitrability with respect to retiree grievances and even if

---

        [7] USWA has not filed a similar counterclaim.

        [8] IAM avers that "vested" as used in determining whether disputes over rights under a
prior CBA are arbitrable is different from the word "vested" when it applies to whether rights are
non-terminable without retiree consent under ERISA.

there was, it has lapsed with time, 4) under the CBAs, retiree benefits are not arbitrable, 5) IAM

has failed to prove that there are no material facts in issue precluding summary judgment, and

6) under recent case law, IAM lacks standing to arbitrate retiree benefits.

Whether IAM has standing to pursue arbitration of retiree benefits claims and whether

this dispute is arbitrable pursuant to effective arbitration clauses included in the CBAs need not

be decided here because IAM has waived its right to arbitration.  The Eighth Circuit has adopted

a three prong test for determining when a party claiming the right to arbitration has waived that

right: 1) the party knew of an existing right to arbitration, 2) the party acted inconsistently with

that right, and 3) the party prejudiced the other party by acting inconsistently.[9]  Ritzel

Communications, Inc. v. Mid-American Cellular Tel. Co., 989 F.2d 966, 969 (8th Cir. 1993),

citing Stifel, Nicolaus & Co. v. Freeman, 924 F.2d 157, 158 (8th Cir. 1991).

IAM certainly knew of its alleged right to arbitration.  On December 11, 2003, IAM filed

a grievance on the issue of whether Rexam has the right to unilaterally alter or amend retiree

health benefits.  IAM Ex. 10 [Docket No. 191].  The following day, IAM filed an answer in this

case in which it asserted an affirmative defense that Rexam failed to exhaust contractual

remedies, and filed a counterclaim to compel arbitration.  However, rather than immediately

pursuing its claimed right to arbitration, IAM participated in extensive discovery, including

document production, interrogatories, and party and non-party depositions, as well as pre-trial

proceedings, including filing a motion requesting a jury trial and an appeal of that motion.  IAM

did not file a summary judgment motion on its counterclaim to compel arbitration until

---

[9] This test appears to have been developed in the context of contracts including
arbitration clauses that are governed by the Federal Arbitration Act, but the test logically should
apply with equal force to the issue of waiver with respect to an arbitration clause in a CBA.

September 15, 2005, almost two years after IAM initially filed its counterclaim to compel arbitration.  IAM's participation in advancing the litigation as well as its long delay in pursuing its claimed right to arbitration are actions inconsistent with its current desire to arbitrate this dispute.

In addition, Rexam represents that 33% of its costs could have been avoided if IAM had pursued arbitration earlier rather than participating in extensive discovery.  Rexam Mem. in Opp'n to IAM's Mot. for Summ. J. [Docket No. 216] at 6 n.6.  While the Court recognizes that the lawsuit was initiated by Rexam and not IAM, and that some document discovery conducted in this proceeding may have also occurred in an arbitration proceeding, the amount of discovery and motion practice that has occurred over the last two years could have been avoided if IAM had earlier pursued its claimed right to arbitration.  IAM's delay and inconsistent actions caused prejudice to Rexam, and therefore IAM has waived its right to arbitration.

**C.      Standing**

In its summary judgment motion, IAM argues Rexam's ERISA claims against IAM should be dismissed for lack of subject matter jurisdiction because the declaratory judgment act does not provide an independent basis for jurisdiction, and IAM does not have the ability to bring a coercive action against Rexam under ERISA.  At oral argument, Rexam conceded that it has no ERISA claims against IAM.  Accordingly, Rexam's claim for a declaratory judgment under ERISA against IAM is dismissed.

**D.      Standard for Reviewing Vesting Claim**

The parties agree that the plan at issue is a welfare benefit plan under ERISA.  29 U.S.C. § 1002(1).  Under ERISA, welfare benefit plans, unlike pension benefit plans, are not subject to

mandatory vesting requirements. §§ 1051(1), 1053(a); <u>Anderson v. Alpha Portland Indus., Inc.</u>, 836 F.2d 1512, 1516 (8th Cir. 1988).  An employer may unilaterally modify or terminate welfare benefit plans "absent the employer's contractual agreement to the contrary."  <u>Howe v. Varity Corp.</u>, 896 F.2d 1107, 1109 (8th Cir. 1990).  Therefore, the issue presented here is one of contract interpretation, and any vesting promise must be "incorporated, in some fashion, into the formal written ERISA plan."  <u>Id.</u>; <u>United Paperworkers Int'l Union. v. Jefferson Smurfit Corp.</u>, 961 F.2d 1384, 1386 (8th Cir. 1992).

ERISA plan documents follow the law of trusts: "The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.'"  <u>Hughes v. 3M Retiree Med. Plan</u>, 281 F.3d 786, 790 (8th Cir. 2002), <u>citing</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 112 (1989).  "Other evidence is admissible if the language of the plan provision at issue is ambiguous."  <u>Id.</u>

> That intent [of the settlor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings.  If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes . . . .  The third step becomes necessary when the intent or meaning of the settlor cannot be determined by reference to the provisions of the trust instrument itself.  Extrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.

<u>Id.</u>, <u>citing</u> George G. Bogart, *The Law of Trusts & Trustees*, § 182 (rev. 2d. ed. 1979 & Supp. 1993) (footnotes omitted).  However, the Eighth Circuit has stated with regard to interpreting CBAs that extrinsic evidence can be considered in the first instance to determine whether ambiguity exists.

Although extrinsic evidence may not be admitted to contradict the parties intentions as

expressed in the writing, it can be admitted to demonstrate that ambiguity exists. To determine whether there is an ambiguity, we must examine the relevant extrinsic evidence and decide whether the contractual language is reasonably susceptible of the meaning proposed by the party asserting the ambiguity. If we decide that the language is ambiguous, then resolution of the ambiguity is a question of fact to be determined by the jury.

John Morrell & Co. v. Local Union 304A of the United Food and Commercial Workers, AFL-CIO, 913 F.2d 544, 551 (8th Cir. 1990) (Morrell I).

"Each provision of the [CBAs and plan documents] should be read consistently with the others and the terms must be construed to render none of them nugatory and to avoid illusory promises." John Morrell & Co. v. United Food and Commercial Workers Int'l Union, 825 F. Supp. 1440, 1451 (D.S.D. 1993). In this declaratory judgment action, the Defendants have the burden of proving by a preponderance of the evidence that their welfare benefits have vested. See DeGeare v. Alpha Portland Indus., Inc., 837 F.2d 812, 815 (8th Cir. 1988); Morrell, 825 F. Supp. at 1450 ("The burden does not shift simply because retirees are defendants in this declaratory judgment action.").

**E.     Rexam's Motion for Summary Judgment against IAM**

Rexam asserts several arguments in support of its contention that IAM retirees' welfare benefits have not vested. First, Rexam argues that the relevant documents include no express vesting language. Next, Rexam argues that the relevant documents include clauses that the Eighth Circuit has previously determined are evidence of no vesting: 1) a reservation of rights ("RR") clause, 2) a continuation clause, 3) a coordination of benefits clause, and 4) a duration clause.[10]  Rexam argues that the cumulative effect of the lack of express vesting language and the

---

[10] Pursuant to Fed. R. Evid. 1006, Rexam has provided charts that summarize and compare relevant clauses from all of the CBAs and plan documents between Rexam and the

inclusion of the four clauses that evidence no vesting is that the IAM retirees' welfare benefits have not vested.  The Court will address each of Rexam's arguments in turn.

### 1.     Express Vesting Language

Rexam first argues that for retiree welfare benefits to vest, there must be express vesting language in either the CBAs or plan documents.  Absent express language, Rexam can unilaterally modify or terminate benefits at any time.  Rexam argues that none of the CBAs or plan documents governing IAM retirees have express vesting language with respect to retiree welfare benefits, in sharp contrast to vesting language used in the documents regarding the Expanded Employment Program and the Deferred Vested Retirement Pension.  Rexam avers that this dichotomy shows that Rexam and IAM knew how to use express vesting language, and could have used it if they had intended for welfare benefits to vest.

Rexam overstates the law of the Eighth Circuit on the requirement of express vesting language.  In retiree welfare benefit cases, the Eighth Circuit has routinely examined clauses in CBAs and ERISA plan documents that do not include express vesting language in order to determine whether the parties intended for benefits to vest.  In <u>Anderson</u>, with respect to a clause in a document that was held to be evidence of intent not to vest benefits, the Eighth Circuit stated "[t]he question before us is not whether any specific words appear, but whether the parties intended benefits to vest.  Intent, or lack thereof, may be proved in more ways than one, and the absence of [a specific word], while relevant to our inquiry, certainly is not dispositive."

---

unions.  <u>See</u> Rexam App. Against IAM 1; Rexam App. Against USWA 1-4.  Rexam avers that it has copies of almost all of the CBAs and plan documents between the parties, and while it has provided only a few complete CBAs to the Court, Rexam will provide complete CBAs in its possession to the Court upon request.

Anderson, 836 F.2d at 1519.  While the lack of express vesting language is evidence of intent not

to vest benefits, it does not, by itself, end the inquiry with respect to vesting.  See John Morrell

& Co. v. United Food & Commercial Workers Int'l Union, AFL-CIO, 37 F.3d 1302, 1304, 1307

(8th Cir. 1994) (Morrell II).

> **2.      "Until Death" Clause**

Rexam next argues that language in several plan documents and SPDs that informs the

retirees that their benefits continue until death is not synonymous with benefits being vested.

IAM responds that the Eighth Circuit has found language about benefits continuing until the

death of the retiree to be probative of vesting.

The Retired Group Insurance Plan, appended to the 1977 CBA, has a clause entitled

"When Your Insurance Ceases," and states: "Your medical expense benefits discontinue upon

your death.  Your death will not affect the continuance of benefits for your spouse and, effective

April 1, 1979, your dependent children.  Any coverage continued after your death will, however,

terminate upon remarriage or the death of your spouse."  IAM Ex. 2(D) at R001082.  Every CBA

or plan document in existence between IAM and Rexam includes similar, if not identical, "until

death" language.  The Eighth Circuit has examined "until death" or "for lifetime" language, and

while the Eighth Circuit has never held that such clauses prove vesting by themselves, the Eighth

Circuit has considered them to be evidence of intent to vest benefits.  See Jensen v. Sipco, Inc.,

38 F.3d 945, 950 (8th Cir. 1994) ("We have previously noted that this type of provision supports

an argument that retiree benefits are vested.").  Such language should not be viewed in a vacuum

and must be considered with other clauses in the CBAs and plan documents.  See Alpha, 836

F.2d at 1518.  At this stage of the contract analysis, the "until death" language is evidence of

intent to vest benefits.

### 3.    Duration Clause

Rexam argues that every CBA between Rexam and IAM includes an explicit duration clause, stating that retiree welfare benefits under the CBA will remain in effect only until a certain date, usually either the termination date of the CBA or ninety days thereafter.  Rexam argues that the durational language precludes vesting, while IAM maintains that such language is only one factor to consider, and the durational language used here is distinguishable from that in other cases.

The duration clause in the 1977 CBA between IAM and Rexam states: "Notwithstanding any other provisions of this agreement, Article 11, Group Insurance Plan, shall remain in effect until and including June 30, 1981."  Rexam App. Against IAM 4 at 75.  The duration clause in all of the other CBAs is either identical or nearly so.  See id. 1.  The Eighth Circuit has found duration clauses evidence the parties' intent that benefits be non-vested, and has stated that "[i]t would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date."  Morrell II, 37 F.3d at 1307; Anderson, 836 F.2d at 1519.  However, like the "until death" clause, the duration clause is just one clause to consider in the context of the entire CBAs and plan documents.  See Morrell II, 37 F.3d at 1307-08; Anderson, 836 F.2d at 1518-19.  The duration clause is evidence of an intent not to vest benefits but is not determinative of vesting.

### 4.    Coordination of Benefits Clause

Rexam argues that the inclusion of coordination of benefits clauses in every CBA and in

the plan documents is strong evidence against vesting, as those clauses allow benefits to be reduced in the future if some third party, typically Medicare, provides duplicate benefits.  IAM responds that coordination of benefits clauses are not per se evidence of lack of intent to vest benefits.  Also, Rexam's pension plans have coordination of benefits clauses, but because pension benefits are vested, those clauses are obviously not evidence of non-vesting.

Every CBA between IAM and Rexam since 1959 includes a coordination clause that states: "In those locations where State or Federal laws may provide for similar social welfare plans, the company will adjust the benefits of the two company plans to the extent the benefits provided by such laws duplicate those benefits of the above mentioned company plans."  Rexam App. Against IAM 1; 4 at 49.  The Eighth Circuit has held that coordination of benefits clauses are inconsistent with vesting, and has stated that "the Plan cannot be interpreted to provide vested rights for prior retirees in one provision and to take such rights away in another."  Morrell II, 37 F.3d at 1307; Anderson, 836 F.2d at 1519.  Again, the coordination of benefits clause is just a factor to consider in the entirety of the documents.  At this stage of the analysis, the coordination of benefits clause will be considered to be evidence of an intent not to vest benefits.

### 5.    Continuation Clause

Rexam argues that since every CBA includes a continuation clause, which states that the company will continue to pay the cost of the plan, it is evidence that benefits are not vested, because if they were, the continuation clause would be duplicative of a promise that already exists.  In a now familiar refrain, IAM responds that the continuation clause is just one factor to consider in determining whether the documents show an intent for benefits to vest, and that the

continuation clause in this case is distinguishable from the continuation clauses in other cases cited by Rexam.

The continuation clause in every CBA from 1971 to the present states: "The Company will continue to pay the entire cost of the Retired Group Insurance Plan as included in this Agreement." Rexam App. Against IAM 1; 4 at 47. Eighth Circuit case law does support the argument that generally, continuation clauses in CBAs or plan documents are evidence of an intent that benefits are not vested. <u>Morrell II</u>, 37 F.3d at 1307; <u>DeGeare</u>, 837 F.2d at 816; <u>Anderson</u>, 836 F.2d at 1519. However, the continuation clauses in this case, guaranteeing that Rexam will continue to pay the cost of the insurance plan, are different from the continuation clauses in the cases relied upon by Rexam, which typically state that the company would continue the insurance plan itself. Also, continuation clauses are again just one factor to consider when analyzing the entire contract. The continuation clause here is slight evidence of intent that the benefits are not vested.

### 6. Reservation of Rights Clause

Rexam argues that it is settled law that a RR clause is inconsistent with a claim of vested benefits, and that every plan document since 1971 has included a RR clause. Rexam further argues that the current version of the RR clause, in effect since 1994, clearly disproves vesting, and earlier versions of the RR clause, despite the inclusion of phrases that could be interpreted as limiting the company's ability to modify or terminate benefits subject to particular conditions, did not prevent the company from unilaterally modifying benefits.

IAM responds that while a RR clause can disprove an intent to provide vested retiree benefits, that principle applies only in cases in which the RR clause is unambiguous. In this

14

case, the RR clauses are ambiguous because they include qualifications that could be interpreted

as limiting the company's ability to modify or terminate benefits to situations in which

modification or termination is required by a change in the law.  IAM also argues that the current

RR clause, adopted in 1994, does not apply to any of the retirees because it was adopted

unilaterally, outside of the collective bargaining process, and IAM only discovered its existence

during the instant litigation.

Early plan documents can not be located.  The first available plan documents, from 1971,

include a RR clause that states: "American expects to continue this Plan indefinitely, but

necessarily reserves the right to amend, modify, or discontinue the Plan in the future in

conformity with applicable legislation and also subject to any collective bargaining agreement."

Rexam App. Against IAM 7 at R000457.  This RR clause remained in plan documents until

1987, at which time it was modified slightly.  Id. 1.  From 1987 to 1994, the RR clause

promulgated in the White Book and applicable to retirees stated: "American National expects to

continue this Plan indefinitely, but necessarily reserves the right to amend, modify, or

discontinue the Plan in the future in conformity with applicable legislation."  Id. 10 at R012727.

In 1994, Rexam modified the RR clause in Plan 583, and this version of the RR clause,

according to Rexam, remains the applicable clause today.  It states: "The Company reserves the

right to amend, modify or terminate the Plan, in whole or in part or any benefits provided

hereunder (including any coverage schedule) at any time, and for any reason."  Id. 11 at

R071118.

Both Rexam and IAM cite Alexander v. Primerica Holdings, Inc., 967 F.2d 90 (3d Cir.

1992), a case that found ambiguous a RR clause with language that modification was "subject to

a collective bargaining agreement." IAM argues that <u>Primerica</u> dictates that the RR clause in this case is ambiguous, while Rexam argues that <u>Primerica</u> is distinguishable from this case. The Court finds that the earlier versions of the RR clause are ambiguous. They are susceptible of two different interpretations; either: 1) the company has no power to modify or terminate the plan, unless the company is required by law or the CBA to modify or terminate the plan, or 2) if the company exercises its right to modify or terminate the plan, it must ensure that its modification or termination complies with applicable law or the CBA. Because the earlier RR clauses are ambiguous, the Court must seek to elucidate their meaning by examining them within the context of the entire document, and possibly also with extrinsic evidence, unless the 1994 Plan 583 RR clause superseded the earlier RR clauses.

Rexam argues that the RR clause adopted in 1994 is the RR clause presently in effect for all IAM Basic CBA retirees. IAM responds that the 1994 RR clause does not apply to any of the IAM retirees because: 1) the clause was adopted unilaterally, outside of the collective bargaining process, and a unilaterally adopted RR clause in a plan document cannot vitiate contractually bargained for rights, 2) Rexam did not amend or restate the pre-1994 SPDs, which included the above-described ambiguous RR clauses, and 3) the 1994 RR clause could not be made retroactively applicable to retirees who retired prior to 1994.

Rexam has asserted that the White Book is the SPD for Plan 583. The Eighth Circuit has stated that "in the event of a conflict between formal plan provisions and summary plan provisions, the summary plan description provisions prevail." <u>Barker v. Ceridian Corp.</u>, 122 F.3d 628, 633 (8th Cir. 1997) (<u>Barker I</u>). Because the 1994 Plan 583 RR clause conflicts with the RR clause in the applicable SPD—the 1987 White Book—the RR clause in the SPD prevails.

Therefore, the 1987 White Book RR clause, found above to be ambiguous, is the operative RR clause, not the 1994 Plan 583 RR clause. Rexam argues that retirees were given notice of the change to the RR clause in a Summary of Material Modifications ("SMM") letter sent to all retirees in 1994. See Rexam App. Against IAM 12. However, that letter was sent for the purpose of notifying retirees of changes in their prescription drug benefits, and only incidentally stated the newly-worded RR clause. The "average plan participant" would not have understood the SMM letter to be notice of an amendment to the RR clause. See 29 U.S.C. § 1022(a)(1); Harris v. Blue Cross Blue Shield, of Mo., 995 F.2d 877, 880 (8th Cir. 1993); Maxa v. John Alden Life Ins. Co., 972 F.2d 980, 984 (8th Cir. 1992). As a result, the Court gives no weight to the 1994 Plan 583 RR clause in its contract analysis. The earlier RR clauses, enunciated in Rexam's SPDs, are ambiguous and therefore can not be interpreted independently as evidence either in favor of or against an intent to vest benefits.

### 7. Extrinsic Evidence

As stated above, none of the clauses identified by either Rexam or IAM are conclusive evidence to support or contradict an intent to vest benefits. Instead, the clauses must be considered in the context of the entirety of the CBAs and plan documents to determine whether or not Rexam intended to vest benefits. When considered in their entirety, the Court finds that the CBAs and plan documents are ambiguous on intent to vest benefits. An analysis of the documents does not establish that the parties clearly intended not to vest benefits. While there is no express vesting language, there is language suggesting that benefits continue until death. Language in an ERISA plan must be given its common and ordinary meaning, interpreted in the way that a reasonable person in the position of the plan participant would have understood the

17

words.  See Barker I, 122 F.3d at 634.  In this case, a person in the position of the plan

participant could very reasonably have interpreted the "until death" language to mean that his

benefits would last for the rest of his life.

While the duration and coordination of benefits clauses weigh against a finding of intent

to vest benefits, they do not completely outweigh the "until death" language.  In addition, the

continuation and RR clauses are too ambiguous to aid in a resolution of the inquiry.  The

continuation clause could be merely an affirmation of Rexam's agreement to pay benefits for

life, while the RR clause could actually limit Rexam's ability to modify or terminate benefits,

rather than strictly reserving the right to do so.  Consequently, extrinsic evidence must be

examined to aid in determining the intent of the parties.

Both parties supply extrinsic evidence to support their respective positions.  Rexam avers

that benefits have changed over the years, both positively and negatively, and both unilaterally

by the company and through negotiation with IAM.  Rexam argues that such changes evidence

that benefits are not vested.  IAM responds that the changes were either beneficial or of no

consequence.  Even if they may have altered a benefit, the alterations went unchallenged because

IAM perceived the changes as favorable.  Meanwhile, IAM offers the testimony of former IAM

negotiators and company officials who believe that benefits are vested for life.  See IAM Exs. 20

at 134-36, 159; 21 at 61-62, 79-82, 131; 22 at 25-28; 23 at 6, 22, 102, 109, 115-16, 119-20, 124,

157; 24 at 18, 55-56, 58, 83, 86; 25 at 46-48.

At this stage, IAM has proffered sufficient extrinsic evidence to create a genuine issue of

material fact.  The Court is mindful that it is IAM's burden to prove by a preponderance of the

evidence that benefits vested, and ultimately, IAM may be unable to do so.  While some cases in

this circuit similar to the instant case were decided on summary judgment, many were decided only after a trial in which extrinsic evidence was introduced.  Compare Stearns v. NCR Corp., 297 F.3d 706, 712 (8th Cir. 2002) (granting summary judgment for employer), and Hughes, 281 F.3d at 793 (same), and Jefferson Smurfit, 961 F.2d at 1386 (same) with Barker v. Ceridian Corp., 193 F.3d 976, 983 (8th Cir. 1999) (Barker II) (reversing judgment for employer after bench trial; case tried after initial grant of summary judgment for employer was reversed in Barker I, 122 F.3d at 639), and Jensen, 38 F.3d at 953 (affirming judgment for retirees after bench trial), and Morrell II, 37 F.3d at 1308 (affirming judgment for employer after bench trial), and DeGeare, 837 F.2d at 817 (same), and Anderson, 836 F.2d at 1521 (same).  The cases that were decided on summary judgment all included RR clauses that were completely unambiguous and unmodified, unlike the relevant RR clauses in this case.[11]  See Stearns, 297 F.3d at 709, 712; Hughes, 281 F.3d at 792-93; Jefferson Smurfit, 961 F.2d at 1385-86.  The fact issues remaining make this case inappropriate for summary judgment.

F.     **Rexam's Motion for Summary Judgment against USWA**

Rexam makes essentially the same arguments against USWA as it did against IAM: retiree welfare benefits have not vested because the relevant CBAs and plan documents do not include any express vesting language, and also include several of the clauses that the Eighth Circuit has held are evidence of no vesting, including: 1) a RR clause, 2) a continuation clause, 3) a coordination of benefits clause, and 4) a duration clause.  In addition, the Court certified five USWA retiree subclasses, each comprised of USWA retirees who retired during particular time

---

[11] While Plan 583 does include an unambiguous RR clause, that clause is trumped by the ambiguous RR clause in the SPD.

periods or from particular plants.  The Court will address each of Rexam's arguments in turn, and how they impact the varying subclasses.

### 1.        Express Vesting Language

Rexam argues that no CBAs and no plan documents applicable to any USWA retirees include any express vesting language, and therefore benefits are not vested.  As stated above, the lack of express vesting language is evidence of an intent not to vest benefits, but is not alone sufficient to preclude vesting.

### 2.        Lifetime Clause

Rexam argues that clauses that use the words "lifetime" and "discontinue upon your death" do not cause benefits to be vested.  Conversely, USWA avers that such clauses are evidence of vesting and therefore preclude awarding summary judgment to Rexam.[12]

The documents provided for the record by the parties reveal that "until death" language appeared in many CBAs and plan documents for former ACC employees.[13]  An example of such language, appearing in the 1987 Red Book, states: "When Your Insurance Ceases.  Your medical expense benefits discontinue upon your death.  Your death will not affect the continuance of benefits for your spouse and your dependent children.  Any coverage continued after your death will, however, terminate upon remarriage or the death of your spouse."[14]  Rexam App. Against

---

[12] The Court was not provided with a Fed. R. Evid. 1006 summary chart compilation of the "until death" or "lifetime" clauses as it was with respect to the other types of clauses, which made the task of comparing the various "until death" and "lifetime" clauses more difficult.

[13] Former ACC employees could be part of the USWA 583 Plan Subclass.

[14] The Red Book became the SPD applicable to the Whitehouse Plant in 2001. Presumably then, the "until death" language in the Red Book is also applicable to Whitehouse retirees.

USWA 6 at R012990.

A review of CBAs and plan documents for former NCC employees reveals "lifetime" language that is not as strong as that found in ACC agreements.[15] The following language is found in an appendix to the 1981 NCC/USWA CBA, amending the Group Insurance Agreement: "Effective March 1, 1981.  The surviving spouse of an active employee who is eligible to receive the preretirement joint and survivor benefit will be covered as a dependent for his or her lifetime under the Retired Employees Group Insurance Plan."[16]  Feinstein Aff. [Docket No. 217] Ex. 22 [Docket No. 219] at R004841.  Other than that clause, USWA relies on the extrinsic evidence of other union/company documents and deposition testimony for the proposition that benefits vested.  For example, USWA points to a 1981 collectively bargained settlement agreement which states: "Effective January 1, 1983, Company-paid major coverage will be provided for all retirees and surviving spouses of retirees (and dependents) who are eligible for Medicare. . . . These new benefits represent a significant expansion of the lifetime coverage under the retiree's insurance program."  Feinstein Aff. Ex. 6 at R62424.  USWA further avers that in 1981, the four major can companies, ACC, NCC, Crown Cork & Seal, and Continental Can, engaged in joint

---

[15] Former NCC employees could be members of either the NCC USWA Subclass, the ANC USWA (Former NCC Plants) Pre-583 Plan Subclass, or the USWA 583 Plan Subclass.

[16] The 1981 NCC/USWA CBA was continued in 1984 by way of extension agreement with no apparent changes to this "lifetime" language.  Feinstein Aff. Ex. 24 [Docket No. 219] at USWA-RX00152.  The "lifetime" language appears to be extended without change in the 1986 NCC/USWA CBA, 1989 ANC/USWA CBA, 1993 ANC/USWA CBA, and 1998 ANC/USWA CBAs.  Feinstein Aff. Exs. 27 [Docket No. 219] at R004930, 30 [Docket No. 219] at R054748, 32 [Docket No. 219] at R005105, 63 [Docket No. 221] at R005270.  The Court arrives at this conclusion through extension and continuation language in those documents, and no apparent amendments to the 1981 "lifetime" language, although the 1981 "lifetime" language does not appear to be specifically restated in successive CBAs and plan documents.

bargaining with USWA about insurance coverage and all signed settlement agreements with identical "expansion of lifetime coverage" language.  Feinstein Aff. Exs. 5 [Docket No. 217] at USWA-RX00085; 6 at R62424; 7 [Docket No. 217] at USWALH08126; 8 [Docket No. 217] at 32, 33.

The parties have not identified any "until death" or "lifetime" language in any documents covering the Valparaiso Plant or Whitehouse Plant subclasses.[17]  A review of the only complete Valparaiso document provided, the 1984 Group Life Insurance and Health Care Program for Retired Employees of National Can, has disclosed two sections in which "lifetime" language is used.  In section 3, entitled Major Medical Expense Benefits for Those not Eligible for Medicare, and section 5, entitled Supplemental Major Medical Expense Benefits for Those Eligible for Medicare, the plan states: "The maximum benefit for any individual is $30,000 in any one calendar year.  However, there is a maximum lifetime limit of $100,000 for all covered medical expenses."  Rexam Reply App. Against USWA [Docket No. 233] 3 at R056583, R056589. While this language is not as strong as the "until death" language in ACC agreements, a retiree reading this language may reasonably believe his benefits vested.  As stated above, language in the various CBAs and plan documents that benefits were for "lifetime" or "until death" evidence an intent to vest benefits.

### 3.    Duration Clause

---

[17] The parties have not included in the record representative CBAs and plan documents for the Valparaiso and Whitehouse plants to the same extent that the parties did for the former ACC and NCC retirees employed under Basic and Master CBAs, and so the Court has had to rely primarily on the representations made by the parties in the Memorandums of Law and the Fed. R. Evid. 1006 summaries.  As stated earlier, the Red Book, which includes "until death" language, became the SPD applicable to the Whitehouse Plant in 2001.

Rexam focuses on the various duration clauses included in the various USWA CBAs as the "most compelling" evidence of the company's intent not to vest benefits.  Every CBA between Rexam and USWA includes a duration clause that includes a date on which either the agreement generally, or the insurance plan specifically, will no longer be effective.  See Rexam App. Against USWA 1, 2, 3, 4.  While the language of the duration clauses varies slightly between the CBAs of the different subclasses, all of the clauses are substantively the same.  An example is the duration clause in the 1993 CBA between ANC and USWA: "Notwithstanding any other provisions of this Agreement, Article 21, Group Insurance Plan, shall remain in effect until and including May 31, 1998, except for Weekly Sickness and Accident Benefits, which coverage shall expire on February 22, 1998."  Rexam App. Against USWA 5 at R003722.

Rexam insists that the duration clauses alone are sufficient to support a finding of no intent to vest benefits, and that if the Court does find a material issue of fact with regard to intent to vest benefits, then it has ignored the duration clauses.  However, no court has found that a duration clause alone resolves the vesting question, but rather, such a clause is evidence of no intent to vest benefits in conjunction with other clauses in the agreements, when viewed in their entirety.  Consequently, at this stage of the analysis, the duration clause is but one clause that evidences an intent not to vest benefits, and it must be considered in due course in the totality of the relevant documents.

### 4.    Coordination Clause

Rexam asserts that coordination clauses, found in every USWA Plan and in most Basic CBAs, are compelling evidence of non-vesting.  USWA responds that coordination clauses relied upon in other cases are distinguishable and a coordination clause is just one factor to

consider in the totality of the circumstances.  The language of the coordination clauses in the

plan documents varies between the different USWA subclasses, but each conveys essentially the

same concept: any benefits provided under the Rexam plan will be reduced if similar benefits are

provided through Medicare or another employer insurance plan.  See Rexam App. Against

USWA 1, 2, 3, 4.  An example of a coordination clause appearing in the 1987 Red Book is as

follows:

> Coordination with Medicare.  Because of the very comprehensive coverages available
> under Medicare, benefits under the Basic Medical and Major Medical Plan for any person
> covered by Medicare will be modified in order to avoid any duplication of hospital,
> medical care benefits or physicians' services.  American National benefits otherwise
> payable will be reduced by the benefits payable for the same procedure or expenses under
> Medicare (Parts A and B) for which you or your dependent are eligible or would have
> been eligible had timely and proper application been made.

Id. 6 at R013018.  As stated above, a coordination clause is just one clause to consider within the

context of the entirety of the documents.  At this stage of the analysis, it is sufficient to state that

coordination clauses have generally been found to be evidence of an intent not to vest benefits.

### 5.    Continuation Clause

Rexam argues that continuation clauses, present in almost every Basic and Master CBA,

are evidence of non-vesting, because if benefits were vested, there would be no need for Rexam

to effectively restate its promise to pay for benefits for life.  USWA avers that the continuation

language in this case is distinguishable from that in other cases, and when considered in the

totality of the circumstances, may actually be evidence of an intent to vest benefits rather than

precluding vesting.

The language of the continuation clauses varies slightly between the different subclasses,

but each clause essentially states that the company will pay the entire cost of the insurance plan.

See Rexam App. Against USWA 1, 2, 3, 4. An example of a continuation clause from the 1993 CBA between ANC and USWA is: "The Company will continue to pay the entire cost of the Retired Group Insurance Plan as described in a separate booklet entitled 'Group Insurance Plan.'" Id. 5 at R003703. Notably, the Valparaiso Plant Subclass CBAs have no continuation clauses, and the CBAs between NCC and USWA did not include continuation clauses until 1977. Id. 1, 2, 3, 4. While continuation clauses have previously been considered to be evidence of an intent not to vest benefits, they are again just one factor to consider when analyzing the entire contract. In addition, as USWA suggests, the continuation clauses could also be interpreted as a continuing reaffirmation of the company's obligation to pay insurance costs, and were not intended to speak to whether or not benefits are vested. While recognizing that continuation clauses have previously been found to be evidence that benefits are not vested, the continuation clauses in this case are arguably susceptible of the opposite interpretation. Fact issues remain, making this case inappropriate for summary judgment.

### 6.        Reservation of Rights Clause

Rexam argues that an unambiguous RR clause, without more, is a sufficient basis for the Court to grant summary judgment to Rexam, and all Master and Basic CBAs have included an unambiguous RR clause applicable to all retirees since 1994. The Valparaiso and Whitehouse Plans included similar RR clauses. Rexam also avers that the RR clauses in effect prior to 1994 have been superseded and therefore USWA and the retirees can not rely on any of the previous clauses. Even if they could, those clauses also do not confer vested benefits or establish conditions precedent to Rexam's ability to modify benefits.

On the other hand, USWA argues that the RR clauses prior to 1994 included conditions

precedent that severely limited Rexam's ability to modify benefits.  Also, USWA argues that the

RR clause unilaterally adopted by Rexam in 1994 can not supersede rights that were collectively

bargained.

### a.      Former ACC Employees RR Clause

The RR clause that frequently appeared in plan documents between ACC and USWA

states:

> Extent and Limit of Coverage.  American expects to continue this Plan indefinitely, but
> necessarily reserves the right to amend, modify, or discontinue the Plan in the future in
> conformity with applicable legislation and also subject to any applicable collective
> bargaining agreement. . . .  If any changes become effective under the Medicare Program
> by reason of current or future Governmental legislation or regulation, then full
> consideration will be given to appropriate modification in this Retired Group Insurance
> Plan.

Feinstein Aff. Ex. 1 [Docket No. 217] at R003137.  The ACC RR clause in effect from 1959 to

1966, and the ANC RR clause in effect from 1987 to 1994, were very similar, except they did

not include the phrase "and subject to any applicable collective bargaining agreement."  See

Rexam App. Against USWA 1, 2, 3, 4.  In 1994, ANC adopted Plan 583, which included an

unqualified RR clause:

> Amendment and Termination.  The Company reserves the right to amend, modify or
> terminate the Plan, in whole or in part, or any benefits provided hereunder (including
> under any Coverage Schedule) at any time, and for any reason.  In addition, the Plan as
> applied to any Employer may be terminated at any time by that Employer provided that
> the Company is furnished written notice of such action by the Employer.
> Notwithstanding the foregoing, no amendment or termination made pursuant to this
> subsection shall operate to reduce the amount of any benefits which became payable
> under the Plan prior to such action.

Rexam App. Against USWA 8 at R071118.  Notably, despite the adoption of the new RR clause

in Plan 583, the prior version of the RR clause, including the language "in conformity with

applicable legislation," remained in effect in the Red Book, which functioned as a SPD for Plan

583.  Id. 6 at R012989.  As was determined with IAM, the Healthy Options SMM sent to retirees

by Rexam was insufficient to inform the employees that their RR clause was being modified.

### b.      Former NCC Employees RR Clause

Plan documents between NCC and USWA never included a RR clause.  Plan documents

from 1960 to 1987 instead had Termination of Insurance and Conversion Privilege clauses, and

Rexam argues that such clauses are evidence of intent not to vest benefits.  An example of the

termination clause, appearing in the 1979 plan documents, is:

> **Termination of Insurance.**  Insurance for yourself and your dependent spouse will
> terminate if the group policies terminate.  The insurance of a dependent spouse will
> terminate if such person ceases to be your eligible dependent.  Coverage under the Major
> Medical portion of this Plan ceases at the time the individual becomes eligible for
> benefits under Medicare. . . .  The date of termination of the accident and health
> insurance will be, for any of the above reasons, the happening of the event causing such
> termination.

Feinstein Aff. Ex. 2 [Docket No. 217] at R012815.  An example of a conversion clause,

appearing in the 1975 plan documents, is:

> **Conversion Privilege.**  Group Hospital, Surgical and Medical Expense Benefits are
> terminated if your membership in an eligible class of employees is terminated.  However,
> an individual policy of basic Hospital and Surgical Insurance, but not Major Medical,
> may be applied for without submitting evidence of insurability if you have been insured
> for 3 months. . . .  Note: The above CONVERSION PRIVILEGE for Hospital and
> Surgical benefits shall not be applicable with respect to any individual whose insurance is
> terminated by reason of becoming eligible for benefits under Medicare.

Id. Ex. 45 [Docket No. 220] at R012788.

A RR clause did not appear in plan documents affecting former NCC employees until

NCC and ACC merged to form ANC in 1987.  The newly amended plan was set forth in the Buff

Book, and included a RR clause nearly identical to the clause quoted above from the ACC plan.

Rexam App. Against USWA 7 at R012888.  Plan 583 was adopted in 1994 and allegedly applied

to former NCC employees in the same way that it applied to former ACC employees, as

described above.  However, for former NCC employees, the Buff Book with the qualified RR

clause remained in effect as a SPD for Plan 583.

<strong>c.        Former Whitehouse Plant Employees RR Clause</strong>

The Whitehouse Plant Subclass Plan included a RR clause, in effect from 1989 to 2001,

that stated: "The Employer intends to continue The Plan indefinitely but reserves the right to end

or amend it.  Any such action would be taken only after careful consideration and subject to the

provision of any applicable collective bargaining agreement."  Feinstein Aff. Ex. 51 [Docket No.

220] at R027654.  In 2001, the Whitehouse Plant joined Plan 583, and the Red Book became the

applicable SPD.  Rexam App. Against USWA 3.

<strong>d.        Former Valparaiso Plant Employees RR Clause</strong>

It appears, although it is not entirely clear, that plan documents covering the Valparaiso

Plant Subclass members never included a RR clause.  See Rexam App. Against USWA 4;

Feinstein Aff. Ex. 52 [Docket No. 220] at USWA-RX001753; Rexam Reply App. Against

USWA 3.  The 1984 Valparaiso Plan discusses modification of benefits in a coordination clause:

> If subsequent governmental legislation provides for the reduction or elimination of the
> premium for Medicare Part B for any person, the company shall make a corresponding
> reduction or elimination of the benefit payment for such Medicare premium for that
> person and such governmental action shall not require further modification or adjustment
> herein.

Rexam Reply App. Against USWA 3 at R056587.

<strong>e.        RR Clause Analysis</strong>

As discussed with respect to IAM, the Court finds that the unqualified RR clause

28

included in the unilaterally adopted Plan 583 is not the controlling RR clause for retirees that

retired under Master or Basic CBAs.  The SPDs—the Buff Book and the Red Book—included

the qualified RR clause with conditional phrases, and "[w]here the formal plan and the summary

plan description conflict, the employer is bound by the provisions of the summary plan

description."  Barker II, 193 F.3d at 982.  The RR clauses applicable to former ACC, ANC, and

Whitehouse Plant employees are ambiguous, as they are susceptible to two different

interpretations—1) that upon modifying or terminating the plan, the employer must take care to

do so in conformity with applicable legislation or the CBA, or 2) the employer has no power to

modify or terminate the plan, unless required to do so by applicable legislation or the CBA.

The CBA and plan documents in effect between USWA and the Valparaiso Plant, and

USWA and NCC, never included any RR clauses.  While the Insurance Termination and

Conversion clauses included in plan documents between USWA and NCC do not support an

intent that benefits were vested, they also do not necessarily support an intent for benefits to be

non-vested; instead, they merely state hypothetically what happens in the event that insurance

coverage ceases, but include no information as to how, why, or if insurance coverage can cease.

In general, the RR clauses at issue in these plans are either nonexistent, or where they appear, are

just one factor to consider in the vesting analysis.

### 7.    Extrinsic Evidence

As with IAM, the clauses in the various CBAs and plan documents must be considered in

their entirety to determine whether or not benefits vested.  Again, while it raises a close question,

an analysis of the documents does not clearly evidence an intent not to vest benefits.  The CBAs

and plan documents, applicable to the various USWA subclasses, include "until death" or

"lifetime" language that supports an intent to vest benefits.  The documents also lack express

vesting language, and have coordination and duration clauses, which weigh toward an intent not

to vest benefits.  The continuation and RR clauses do not tilt the scales significantly, as they are

ambiguous.  The RR clauses include qualifiers, which could be interpreted to either limit or

strengthen Rexam's ability to modify or terminate benefits.  While some continuation clauses

have been interpreted to express an intent not to vest benefits, the continuation clauses at issue in

this case could also be interpreted as a reaffirmation of Rexam's obligation to continue to pay for

the retirees' benefits.  To be sure, the language expressing an intent to vest benefits is much

stronger with respect to some subclasses than it is with others; however, the existence of

inconsistent clauses on the face of the documents requires extrinsic evidence to resolve the

conflict.  Even if the documents did not appear to be ambiguous on their face, the Court could

still consider extrinsic evidence in the first instance to determine whether ambiguity exists.  See

Morrell I, 913 F.2d at 551.

Both parties have introduced extrinsic evidence.  Rexam has introduced evidence that

benefits changed over the years, and that high-ranking company executives believed benefits to

be non-vested.  See Rexam Reply Aff. Against USWA 2 at 47.  By contrast, USWA avers that

changes made to retiree benefits were viewed as positive and touted by Rexam as such.  In

addition, USWA offers the testimony of former ACC and NCC executives who believed the

benefits provided were "lifetime."  Feinstein Aff. Exs. 4 [Docket No. 217] at 42-44; 9 [Docket

No. 217] at 13, 20.  At this stage of the proceedings, viewing the evidence in the light most

favorable to the non-moving party, USWA has set forth sufficient extrinsic evidence to create a

fact issue, precluding summary judgment.  Again, the Court is mindful that it is USWA's burden

to prove benefits vested by a preponderance of the evidence, and USWA may ultimately be

unable to do so.  However, USWA has alleged sufficient facts to preclude resolving this issue on

summary judgment.  <u>See</u> discussion <u>infra</u> pp.18-19.

## G.      IAM and USWA Joint Motion to Exclude Expert Testimony

IAM and USWA jointly move to exclude portions of the expert testimony of proposed

Rexam witnesses Mark Johnson and Ronald L. Seeber that would allegedly provide inadmissible

testimony as to: 1) the meaning of applicable law, 2) the interpretation of contractual language,

3) the intent of the parties, and 4) the retirees' perception of the alleged unilateral changes to the

medical plans.  Rexam responds that the Defendants' motion is premature, and the Defendants'

objections to the proposed experts are better resolved as a motion in limine at trial.  Rexam

contends the proposed experts' testimony would assist the fact-finder in understanding the nature

of the collective bargaining process and the materiality of various changes to the plan.  At oral

argument, the Defendants acknowledged that this motion is normally brought as a motion in

limine, but the Defendants chose to bring it as a pre-trial motion to seek guidance as to proper

subjects for expert testimony.

The Defendants' motion is denied, as the Court declines at this time to exclude the

proposed expert witnesses' testimony, or to strike particular portions of it.  This matter can be

revisited as a motion in limine either just prior to or at trial.  However, by way of guidance, the

Court generally restricts expert witnesses from testimony as to what the law provides.  <u>Police</u>

<u>Ret. Sys. of St. Louis v. Midwest Inv. Advisory Serv., Inc.</u>, 940 F.2d 351, 357 (8th Cir. 1991)

("Explaining the law is the judge's job.").  Upon satisfying certain conditions, Federal Rule of

Evidence 702 provides that an expert witness may offer an opinion "[i]f scientific, technical, or

other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue." Pursuant to Federal Rule of Evidence 704, expert testimony is not

inadmissible because it embraces an ultimate issue to be decided by the trier of fact.

> A trial court may, however, exclude opinion testimony if it is so couched in legal
> conclusions that it supplies the fact finder with no information other than what the
> witness believes the verdict should be. Doubts about whether an expert's testimony will
> be useful should generally be resolved in favor of admissibility.

Williams v. Wal-Mart Stores, Inc., 922 F.2d 1357, 1360 (8th Cir. 1990). In addition, experts

may testify as to the definition of technical terms and "whether such terms have acquired a well-

recognized meaning in the business or industry," Nucor Corp. v. Neb. Pub. Power Dist., 891

F.2d 1343, 1350 (8th Cir. 1989), but "expert testimony that purports to explain the legal meaning

of a term is forbidden." Ways v. City of Lincoln, 205 F. Supp. 2d 978, 991 (D. Neb. 2002).

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. IAM's Motion for Summary Judgment [Docket No. 182] is **DENIED**;

2. Rexam's claim for a declaratory judgment under ERISA against IAM [Docket No. 3]

is **DISMISSED**;

3. Rexam's Motion for Summary Judgment against IAM [Docket No. 138] is **DENIED**;

4. Rexam's Motion for Summary Judgment against USWA [Docket No. 193] is

**DENIED**; and

5. Joint Defendants' Renewed Motion to Exclude Expert Testimony of Mark Johnson and

Ronald Seeber [Docket No. 186] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  February 21, 2006.

33