UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

REXAM INC.,                                        Civil No. 03-2998 (PJS/JJG)

        Plaintiff,

v.                                                  MEMORANDUM OPINION AND ORDER

UNITED STEELWORKERS OF AMERICA,
AFL-CIO-CLC; INTERNATIONAL
ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS; UNITED
STEELWORKERS OF AMERICA,
AFL-CIO-CLC, LOCAL 0188S; and
WALDO W. SLAGERMAN, MARLENE A.
RUDOLPH, STEVEN J. STOLARSKI,
FRANK KIESWETHER, LARRY ALFORD,
GEORGE A. KNIEFEL, GAIL J. REARICK,
and DWAYNE L. WILSON, Individually,
and as Representatives of Persons Similarly
Situated,

        Defendants.

---

James P. McLoughlin, Jr., Alton L. Gwaltney III, MOORE & VAN ALLEN, 100
Tryon Street North, Suite 4700, Charlotte, NC 28202; Timothy E. Branson,
DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis,
MN 55402, for plaintiff.

Edward J. Feinstein, Stephen M. Pincus, STEMBER FEINSTEIN, 429 Forbes
Avenue, Suite 1705, Pittsburgh, PA 15219; Mark W. Bay, PETERSON
ENGBERG & PETERSON, 400 Second Avenue South, Suite 700, Minneapolis,
MN 55401, for the USWA defendants.

This case — now well into its fourth year, second judge, and umpteen-hundredth page of

filings — is complicated in many respects.  At its core, though, is a deceptively straightforward

question:  Does plaintiff Rexam Inc. ("Rexam") have the right to stop providing health benefits

to its retirees?

Rexam is a large and apparently successful company that manufactures beverage cans and other packaging.  For approximately 50 years, Rexam and its predecessors provided health benefits to their retirees, who numbered in the thousands.  Rexam now wants to stop providing health benefits to retirees who are eligible for Medicare (which is most of them).  The law is clear that Rexam has the right to terminate those benefits, unless at some point in the past either Rexam or one of its predecessors agreed that those benefits would be vested.  Determining whether Rexam or one of its predecessors made such a commitment requires sifting through almost 50 years of collective bargaining agreements ("CBAs"), welfare benefit plans ("Plans"), summary plan descriptions ("SPDs"), and related documents.

Pending before the Court are two motions.  The first is a motion for a preliminary injunction brought by defendants United Steelworkers of America, AFL-CIO-CLC; United Steelworkers of America, AFL-CIO-CLC Local No. 0188S; and individual United Steelworkers of America retirees Waldo W. Slagerman, Marlene A. Rudolph, Steven J. Stolarski, George A. Kniefel, Gail J. Rearick, Frank Kieswether, and Dwayne L. Wilson, on behalf of themselves and the various subclasses that they represent.  Roughly speaking, these defendants — who will be referred to collectively as the "USWA defendants" — ask this Court to rule that Rexam cannot discontinue providing health benefits to its retirees, because those benefits are vested.

The second motion before the Court is a motion for reconsideration brought by Rexam.  Last year, Rexam filed a motion for summary judgment, essentially asking this Court to rule that Rexam can discontinue providing health benefits to its retirees, because those benefits are not vested.  Rexam's motion was denied by Judge Ann D. Montgomery in an order dated February 21, 2006.  Docket No. 250.  Rexam then asked Judge Montgomery for permission to

bring a motion to reconsider her order.  Docket No. 261.  Shortly thereafter, this case —

including Rexam's request — was transferred to the undersigned judge.  After a lengthy hearing

on June 19, 2006, the undersigned gave Rexam permission to move to reconsider some, but not

all, of the February 21 order.  Rexam has now filed that motion.

## I.  BACKGROUND

Rexam is a Delaware corporation with its principal place of business in North Carolina.

Rexam currently operates 17 plants in 14 states, including one plant in Minnesota.  Reilly Aff.

¶¶ 4-5, Jan 31, 2005.  Over the past half-century, Rexam and its predecessors American Can

Company ("ACC"), National Can Company ("NCC"), and American National Can Company

("ANC")[1] have employed thousands of union members in approximately 140 plants.  *Id*.; Mem.

Op. and Order 2, May 25, 2005.

ACC and NCC began providing health benefits to their retirees in 1959 and 1960,

respectively.  Pl.'s Br. Supp. Summ. J. Against USWA Defs. Apps. 1, 2.  In 1987, NCC

purchased the can-packaging division of ACC, and the "merged" companies became ANC.

Schemm Dep. 25, 68; Pangborn Dep. 59.  ANC was purchased a year later by Pechiney, a French

aluminum-products manufacturer. Mem. Op. and Order 3, May 25, 2005; Schemm Dep. 26-27.

Like ACC and NCC before it, ANC provided health benefits to its retirees.  Rexam purchased

ANC from Pechiney in 2000.  Barratt Dep. 136.  Rexam assumed responsibility for

administering the plans that provided health benefits to its predecessors' retirees, and Rexam

provided health benefits to its own retirees.

---

[1]The Court will refer to Rexam and its predecessors as "Rexam" except when it is
necessary to be more specific.

It is undisputed that, over the years, ACC, NCC, ANC, and Rexam made unilateral changes to the retiree health benefit plans.  Rexam portrays these changes as being many, substantial, and harmful to the retirees.  Rexam argues that the fact that the changes were made, and the fact that the unions and retirees did little or nothing to protest the changes, provide strong evidence that health benefit plans were not vested.  *See John Morrell & Co. v. United Food and Commerical Workers Int'l Union*, 37 F.3d 1302, 1307 (8th Cir. 1994) ("[T]he fact that modifications were routinely [made] is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested.").  By contrast, the USWA defendants portray the changes as being few, insubstantial, and, in some cases, beneficial to the retirees.  In the eyes of the USWA defendants, the fact that the unions and retirees went along with the changes is not evidence of much of anything.

In 2002, Rexam unilaterally changed the retiree health benefit plans in a way that no one could regard as insignificant or as beneficial to the retirees.  The change substantially increased the out-of-pocket costs that retirees were required to pay for prescription drugs. Countercl. ¶ 14; Pl.'s Br. Supp. Summ. J. Against USWA Defs. App. 2 col. 6, row 12.  The retirees protested, and, in response, Rexam filed this class action in May 2003, seeking a declaration that it has the right to modify its retiree health benefit plans and an injunction prohibiting all members of the proposed defendant class from instituting any legal action against Rexam with respect to the retiree health benefit plans.  The USWA defendants answered and counterclaimed.

As noted, an employer (such as Rexam) has the right unilaterally to modify or terminate a welfare benefits plan (such as the health benefit plans covering Rexam employees) unless the employer has agreed not to do so — that is, unless the employer has agreed that the benefits

provided under the plan are vested.  *See Ravenscraft v. Hy-Vee Employee Ben. Plan and Trust*, 85 F.3d 398, 401 (8th Cir. 1996).  Often commitments to vest are found in CBAs between employers and the unions representing their employees.  Whether the health benefits of a particular retired worker are vested usually depends on the terms of the CBA that was in effect at the time the worker retired.

Over the years, the United Steelworkers of America ("USWA") and the International Association of Machinists and Aerospace Workers ("IAM") negotiated a number of CBAs on behalf of the employees of ACC, NCC, ANC, and Rexam.  Pl.'s Br. Supp. Summ. J. Against USWA Defs. Apps. 1, 2; Pl.'s Br. Supp. Summ. J. Against IAM App. 1.  These CBAs were typically renegotiated every three to five years.  *Id*.  ACC negotiated "Basic Agreements" with the USWA and the IAM that covered most of those who worked at ACC plants, while NCC negotiated "Master Agreements" with the USWA that covered most of those who worked at NCC plants.  Sometimes ACC or NCC negotiated with a union local for a separate CBA that covered only one particular plant; the parties refer to these plant-specific CBAs as "independent" agreements.  *See, e.g.*, Pl.'s Br. Supp. Summ. J. Against USWA Defs. 3.  Following the "merger" of ACC and NCC in 1987, ANC continued to negotiate Basic Agreements to cover former ACC employees, Master Agreements to cover former NCC employees, and independent agreements to cover particular plants.  Rexam has done likewise since purchasing ANC in 2000.  Mem. Op. and Order 3, Feb. 21, 2006.

Generally speaking, in order for health benefits to be vested, not only must the employer agree in a CBA or elsewhere to vest those benefits, but that agreement "must be 'incorporated, in some fashion, into the formal written ERISA plan.'"  *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949

(8th Cir. 1994) (quoting *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*, 961 F.2d 1384, 1386 (8th Cir. 1992)).  At various times, ACC, NCC, ANC, and Rexam have implemented various Plans and SPDs, some of which were directly incorporated into CBAs or implemented in fulfillment of CBAs.  Among the Plans relevant to this action are the "Red Book," the "Buff Book," and "Plan 583."  Pl.'s Br. Supp. Summ. J. Against USWA Defs. Apps. 6-8.  Prior to 1994, the "Red Book" covered former ACC USWA members and the "Buff Book" covered former NCC USWA members.  Mem. Op. and Order 3-4, Feb. 21, 2006.  In 1994, ANC implemented Plan 583 for all retirees, and the Red Book, the Buff Book, and something called the "White Book" (not relevant here) became SPDs for Plan 583.  Barratt Dep. 182.  Rexam kept Plan 583 in place, and contends that it remains the Plan that currently applies to all its retirees.  Mem. Op. and Order 4, Feb. 21, 2006.

This case is a class action involving hundreds of retirees — people who retired at different times from different employers under different CBAs, Plans, and SPDs.  It is entirely possible that the health benefits of some retirees are vested, while the health benefits of other retirees are not.  For that reason, Judge Montgomery eventually decided to certify the following five subclasses of USWA retirees and their spouses:[2]

> *NCC USWA Subclass* (approximately 553 members) — retirees formerly represented by the USWA who retired from NCC between March 1, 1960 and August 31, 1987 who are receiving benefits or are eligible to receive benefits, and

---

[2]Judge Montgomery declined to certify any classes containing IAM members, and the parties later stipulated to the dismissal of all claims against Lloyd W. Erickson, the sole individual IAM-member defendant.  Claims involving IAM members are currently being litigated in other related cases.  *See, e.g., Angotti v. Rexam Inc.*, No. 06-657 (D. Minn. transferred February 21, 2006).  Although IAM remains a party to this action, it is not involved in either of the motions currently before the Court.

their surviving spouses currently receiving benefits, pursuant to retiree welfare benefit plans sponsored by Rexam.

*ANC USWA (Former NCC Plants) Pre-583 Plan Subclass* (approximately 614 members) — retirees formerly represented by the USWA who worked at former NCC plants and retired from ANC after August 31, 1987 and before August 1, 1994 who are receiving benefits or are eligible to receive benefits, and their surviving spouses currently receiving benefits, pursuant to retiree welfare benefit plans sponsored by Rexam.

*USWA 583 Plan Subclass* (approximately 561 members) — retirees formerly represented by the USWA who retired from ANC and Rexam plants between August 1, 1994 and the present who are receiving benefits or are eligible to receive benefits, and their surviving spouses currently receiving benefits, pursuant to retiree welfare benefit plans sponsored by Rexam.

*Whitehouse Plant Subclass* (approximately 45 members) — retirees formerly represented by the USWA who retired from Rexam's Whitehouse, Ohio plant who are receiving benefits or are eligible to receive benefits, and their surviving spouses currently receiving benefits, pursuant to retiree welfare benefit plans sponsored by Rexam.

*Valparaiso Plant Subclass* (approximately 63 members) — retirees formerly represented by the USWA who retired from Rexam's Valparaiso, Indiana plant who are receiving benefits or are eligible to receive benefits, and their surviving spouses currently receiving benefits, pursuant to retiree welfare benefit plans sponsored by Rexam.

Mem. Op. and Order 20-21, May 25, 2005 (defining the NCC USWA, ANC USWA (Former NCC Plants) Pre-583 Plan, and USWA 583 Plan subclasses);[3] Mem. Op. and Order 6, Sept. 22, 2005 (defining Whitehouse and Valparaiso subclasses).

After Judge Montgomery certified the subclasses, Rexam brought a number of motions, including a motion for summary judgment against the USWA defendants.  Judge Montgomery denied Rexam's summary judgment motion on February 21, 2006, finding that the governing documents, when considered in their entirety, were ambiguous with respect to an intent to vest benefits.  *See* Mem. Op. and Order 29-30, Feb. 21, 2006.  Turning to the extrinsic evidence, Judge Montgomery concluded that the USWA defendants offered enough such evidence to create a genuine issue of material fact regarding whether Rexam or any of its predecessors had agreed to vest retiree health benefits.  *Id.* at 30-31.  It was clear, though, that Judge Montgomery found the question of whether Rexam was entitled to summary judgment to be a close one.  Judge Montgomery also noted that her task had been made more difficult by the failure of the parties to clearly identify and compare the purported vesting language found in the various CBAs, Plans, and SPDs.  *Id.* at 20 n.12.

---

[3]Judge Montgomery granted Rexam leave to file a second amended complaint naming Martha K. Yanosh and Gregory G. George as defendant class representatives for the NCC USWA and ANC USWA (former NCC Plants) Pre-583 Plan subclasses, respectively.  *See* Mem. Op. and Order 17, 22, May 25, 2005.  Although Rexam filed a copy of its proposed second amended complaint in requesting leave to amend, Rexam apparently never formally filed a second amended complaint, and these individuals do not appear on the docket as parties.  In addition, another individual, Larry Alford, appears on the docket as a defendant, but does not appear to be a class representative for any of the subclasses, nor does he appear to be a party to the motions before the Court.  The Court would appreciate some clarification concerning these issues.

On April 21, 2006, Rexam submitted a letter seeking leave to move for reconsideration of Judge Montgomery's denial of summary judgment with respect to the NCC USWA Subclass, citing what Rexam regarded as an error.  Docket No. 261.  Shortly thereafter, the nomination of the undersigned to this Court was confirmed by the U.S. Senate, and this case was designated for transfer from Judge Montgomery to the undersigned.  Judge Montgomery referred Rexam's request for leave to move for reconsideration to the undersigned and encouraged the undersigned to examine this case with "fresh eyes" and reconsider her February 21 order to whatever extent the undersigned deemed appropriate.

At the time this case was transferred, Judge Montgomery also had pending before her a motion for a preliminary injunction brought by the USWA defendants.  This motion was filed in response to Rexam's decision — announced in September 2005 and implemented on January 1, 2006 — to cut off *all* health benefits to retirees who were eligible for Medicare.  The USWA defendants sought a preliminary injunction requiring Rexam to reinstate the terminated benefits and to preserve the status quo until this case is decided on the merits.

On June 19, 2006, the undersigned conducted a four-hour hearing on the USWA defendants' motion for a preliminary injunction and on Rexam's request for permission to move to reconsider Judge Montgomery's order.  The undersigned informed the parties that, like Judge Montgomery, the undersigned had trouble identifying and comparing all of the provisions that allegedly provided evidence of vesting.  In the voluminous papers that had been submitted by the parties, discussion of intrinsic evidence of vesting often blurred into discussion of extrinsic evidence of vesting; discussion of intrinsic evidence of non-vesting often blurred into discussion of extrinsic evidence of non-vesting; and discussion of evidence (intrinsic or extrinsic) of vesting

often blurred into discussion of evidence (intrinsic or extrinsic) of non-vesting.  It was, at times, difficult to follow the parties' arguments.

At the June 19 hearing, the undersigned asked the parties to identify precisely what intrinsic evidence the USWA defendants relied on in arguing that retiree health benefits were vested — and to do so separately and distinctly with respect to each subclass.  In other words, the undersigned asked the parties to identify, with respect to each subclass, exactly which provisions of exactly which CBAs (or Plans or SPDs) allegedly provided vesting.  At the end of the hearing, the undersigned invited the parties to submit supplemental briefs directed to the same issue.  Moreover, based on information that came to light at the hearing, the undersigned gave Rexam permission to move for reconsideration of the denial of summary judgment with respect to the NCC USWA Subclass, the ANC USWA (Former NCC Plants) Pre-583 Plan Subclass, the Whitehouse Plant Subclass, and Valparaiso Plant Subclass.  The undersigned did not give Rexam permission to move for reconsideration with respect to the USWA 583 Plan Subclass.

The parties have now submitted the supplemental briefs requested by the undersigned on June 19, as well as the type of summaries whose absence was lamented by Judge Montgomery.  For example, Rexam has provided the Court with a chronological summary of relevant provisions in the CBAs, Plans, and SPDs.  *See* Rexam's Mem. Supp. Mot. Recons. Apps. 1-4.  The Court has also taken into consideration the parties' previous submissions, including samples of complete CBAs.  *See, e.g.*, Feinstein Aff. Ex. 22, and Plans, *see, e.g.*, Pl.'s Br. Supp. Summ. J. Against USWA Defs. Apps. 6-8.

The supplemental briefs and summaries submitted by the parties are much clearer than the papers that were submitted to Judge Montgomery almost a year ago.  The papers reflect the fact that the parties have taken a great deal of discovery and worked diligently on this case during the ensuing year and, as a result, have a better handle on the evidence.  The Court thanks counsel for both sides for their assistance with this difficult case.

## II.  ANALYSIS

### A.  Standard of Review

As noted, two motions are before the Court: the USWA defendants' motion for a preliminary injunction and Rexam's motion for reconsideration.

As to the former, the standard of review is clear.  This Court must consider four factors in deciding whether to grant a preliminary injunction: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the harm that granting the injunction will inflict on the non-movant; (3) the probability that the movant will succeed on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  A preliminary injunction is an extraordinary remedy, and the party seeking preliminary relief bears the burden of establishing all the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

No single *Dataphase* factor is determinative.  *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 630 (8th Cir. 1991).  When the threat of irreparable injury is great, a court may grant an injunction even if the likelihood of success on the merits is iffy.  *See Dataphase*, 640 F.2d at 113.  Conversely, where the likelihood of success is great, the moving party may need to show less in the way of irreparable harm, *see id*. — although a complete failure to show irreparable harm is

sufficient reason to decline to issue a preliminary injunction, *see Blue Moon Entm't, LLC v. City of Bates City*, 441 F.3d 561, 564 (8th Cir. 2006).  Ultimately, a court must decide whether the balance of equities so favors the movant that the court must intervene to preserve the status quo until the merits are determined.  *See Hill*, 939 F.2d at 630.

The standard of review that applies to Rexam's motion for reconsideration is less clear. The parties apparently view Rexam's request as a Rule 59(e) motion to alter or amend a judgment.  Rule 59(e) motions "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."  *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987), *modified* 835 F.2d 710 (7th Cir. 1987)); *see also* Rexam's Mem. Supp. Mot. Recons. 1 (citing *Hagerman*); USWA Defs.' Resp. to Rexam's Mot. Recons. 3 (discussing Rule 59(e) standards).  A party seeking Rule 59(e) relief may not introduce new evidence that could have been produced before the entry of the judgment, nor can the party offer new legal arguments. *Capitol Indem. Corp. v. Russellville Steel Co.*, 367 F.3d 831, 834 (8th Cir. 2004); *Hagerman*, 839 F.2d at 414.

Rexam, however, has not brought a Rule 59(e) motion to alter or amend a judgment for the simple reason that there is no judgment that can be altered or amended.  Rexam challenges an order denying a motion for summary judgment.  Such an order is not appealable.  *See Wright v. S. Ark. Reg'l Health Ctr.*, 800 F.2d 199, 202 (8th Cir. 1986) ("[U]sually, a denial of summary judgment is not treated as final and cannot be appealed until the conclusion of a case on the merits.").  Because such an order is not "an[] order from which an appeal lies," it is not defined as a "judgment" by Rule 54(a).

-12-

Instead, an order denying a motion for summary judgment is an interlocutory order. "The district court has the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995); *see also Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992) (law of the case doctrine applies only to issues decided by final judgments); *cf.* Fed. R. Civ. P. 54(b) ("[A]ny order . . . which adjudicates fewer than all the claims . . . is subject to revision at any time before the entry of judgment.").  The Court has already given Rexam permission to move for reconsideration, and whether to grant that motion now rests in the "sound discretion" of the Court:

> "[O]n a renewed motion for summary judgment before a second judge, the district court must balance the need for finality against the forcefulness of any new evidence and the demands of justice.  With respect to a non-appealable denial of summary judgment, the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court.  The first judge always has the power to change a ruling; further reflection may allow a better informed ruling in accordance with the conscience of the court.  A fortiori, if the first judge can change his mind after denying summary judgment, and change his ruling, a second judge should have and does have the power to do so as well."

*Engineered Prods. Co. v. Donaldson Co.*, 313 F. Supp. 2d 951, 978 (N.D. Iowa 2004) (quoting *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 48 (2d Cir. 1979)).

Rexam is entitled to prevail on its renewed motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over

a fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]." *Baucom v. Holiday Cos.*, 428 F.3d 764, 766 (8th Cir. 2005).

In considering a motion for summary judgment, a court must resolve factual disputes in favor of the nonmoving party. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987). But before a factual dispute can be resolved in favor of the nonmovant, the nonmovant must first create a factual dispute. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

The nonmovant must present enough facts "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. Evidence is not "sufficient" unless a reasonable jury could return a verdict for the nonmovant. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting Fed. R. Civ. P. 56(e)).

## B.  Vesting Under ERISA

Rexam and the USWA defendants agree that the retiree health benefit plans at issue in this case are "employee welfare benefit plans" for purposes of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. Therefore, the question whether Rexam has the right to modify or terminate those plans is governed by ERISA. *See Morrell*, 37

F.3d at 1303.  The Eighth Circuit has developed a rather distinctive body of case law that guides

district courts in determining whether welfare benefits are vested under ERISA.  That body of

case law is crucial to understanding this Court's resolution of the motions of Rexam and the

USWA defendants.

ERISA makes a critical distinction between pension plans and welfare plans:  "While

pension plans are subject to ERISA's stringent vesting requirements, 29 U.S.C. § 1053, welfare

plans are specifically exempt from such requirements.  29 U.S.C. § 1051."  *Anderson v. Alpha*

*Portland Indus., Inc.*, 836 F.2d 1512, 1516 (8th Cir.1988).  In other words, an employer such as

Rexam may unilaterally modify or terminate health benefit plans unless that employer has

entered into a contract under which the employer has waived that right — i.e., agreed that the

health benefits will be vested.  *See Morrell*, 37 F.3d at 1303-04.  Congress deliberately chose to

exempt health benefits from the vesting requirement — and for good reason:

> Congress evidenced its recognition of the need for flexibility in rejecting the
> automatic vesting of welfare plans.  Automatic vesting was rejected because the
> costs of such plans are subject to fluctuating and unpredictable variables.
> Actuarial decisions concerning fixed annuities are based on fairly stable data, and
> vesting is appropriate.  In contrast, medical insurance must take account of
> inflation, changes in medical practice and technology, and increases in the costs
> of treatment independent of inflation.  These unstable variables prevent accurate
> predictions of future needs and costs.  While these plaintiffs would be helped by a
> decision in their favor, such a ruling would not only fly in the face of ERISA's
> plain language but would also decrease protection for future employees and
> retirees.

*Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988).

Put another way, vesting health benefits is a big deal.  In this case, for example, the

USWA defendants argue that Rexam has no choice but to provide millions of dollars of health

benefits to thousands of retirees and spouses for dozens of years — no matter the cost of medical

care, no matter the demand for medical services, and no matter the financial condition of the

company.  This is obviously not a commitment that any rational employer would undertake

lightly.  It defies common sense to believe that an employer would assume such an enormous

burden — or that employees would win such an enormous benefit — without *someone* making

sure that the commitment was reduced to writing.

Reflecting this common-sense notion, the Eighth Circuit places on the employees the

burden of proving that the employer agreed to vest health benefits.  *Barker v. Ceridian Corp.*,

122 F.3d 628, 634 (8th Cir. 1997); *Anderson*, 836 F.2d at 1517.   Not only must the employees

prove the existence of a vesting agreement, but, as the Eighth Circuit has repeatedly held, the

employees must prove that the agreement was "incorporated, in some fashion, into the formal

written ERISA plan." *United Paperworkers*, 961 F.2d at 1386; *see also Barker*, 122 F.3d at 633

(quoting *United Paperworkers*); *Jensen*, 38 F.3d at 949 (same).

In a footnote to a recent opinion, the Eighth Circuit suggested that an intent to vest health

benefits must be "clear."  *Stearns v. NCR Corp.*, 297 F.3d 706, 712 n.3 (8th Cir. 2002).  Over the

years, though, the Eighth Circuit has often indicated that health benefits can be vested by an

ambiguous provision of a CBA, as long as that provision is reasonably susceptible of being

interpreted to provide vesting.  *See, e.g., Jensen*, 38 F.3d at 950, 953 (affirming judgment for

retirees although the relevant language was "at most an ambiguous expression of an intent to

vest retiree benefits"); *Local Union No. 150-A, United Food and Commercial Workers Int'l*

*Union v. Dubuque Packing Co.*, 756 F.2d 66, 69 (8th Cir. 1985) (finding language that implied

that benefits were to continue sufficient to require examination of extrinsic evidence).  In other

words, the employees must, at a minimum, point to a provision of a CBA or other agreement —

a provision that, in turn, is incorporated into a formal Plan — that is reasonably susceptible of being interpreted as a commitment by the employer to vest health benefits.

"[O]rdinary contract construction principles should be used to determine if the benefits are vested." *DeGeare v. Alpha Portland Indus., Inc.*, 837 F.2d 812, 815 (8th Cir.1988), *vacated and remanded on other grounds sub nom. DeGeare v. Slattery Group, Inc.*, 489 U.S. 1049 (1989); *see also Howe v. Varity Corp.*, 896 F.2d 1107, 1109 n.4 (8th Cir. 1990) ("[B]asic contract interpretation principles . . . apply."). The Court must first examine the governing documents, ignoring the extrinsic evidence. If the documents clearly provide that health benefits are vested, then the benefits are vested. If the documents clearly provide that the health benefits are not vested — or if the documents contain nothing that could reasonably be interpreted as a commitment to vest — then the benefits are not vested. If and only if the documents contain a provision that is ambiguous, but that could reasonably be understood as a commitment to vest, will extrinsic evidence be consulted. *See Howe*, 896 F.2d at 1110 ("As a general rule, . . . extrinsic evidence may not be relied upon where the documents are unambiguous on their face."); *see also Wilson v. Moog Auto., Inc. Pension Plan and Trust for U.A.W.Employees*, 193 F.3d 1004, 1009 (8th Cir. 1999); *Barker*, 122 F.3d at 633, 634-35, 638; *DeGeare*, 837 F.2d at 816; *Anderson*, 836 F.2d at 1517.

### C. Rexam's Motion to Reconsider

Rexam's motion for reconsideration raises the question of whether the health benefits provided to retirees in four subclasses — the NCC USWA Subclass, the ANC USWA (Former NCC Plants) Pre-583 Plan Subclass, the Whitehouse Plant Subclass, and the Valparaiso Plant Subclass — are vested. The burden is on the USWA defendants, with respect to each of these

subclasses, to point to a provision of a CBA or other agreement in which Rexam or one of its predecessors commits to vest retiree health benefits.  The USWA defendants have the further burden, with respect to each of these subclasses, of pointing to a provision of a Plan that incorporates the agreement to vest.

No express vesting language exists in any CBA, Plan, or SPD.  In other words, after three years of discovery involving thousands of pages of documents created over almost a half-century, the USWA defendants are unable to point to a single sentence in any CBA, any Plan, or any SPD in which Rexam or one of its predecessors plainly says:  "We agree that retiree health benefits are vested."  In the words of the Eighth Circuit, "The absence of any explicit vesting language . . . is strong evidence of the parties' intent to limit retiree benefits to the term of the Master Agreement."  *Morrell*, 37 F.3d at 1307.

This "strong evidence" is made virtually conclusive by the fact that, while the governing documents do not contain a single express vesting clause, they do contain several types of clauses that evidence a *lack* of intent to vest benefits.  For example, many of the governing documents include continuation clauses and coordination-of-benefits clauses, both of which are, in the words of the Eighth Circuit, "inconsistent with vesting."  *Id*.  Most importantly, beginning in at least 1968 and continuing until at least 2004, every Master CBA between the USWA and Rexam (or one of its predecessors) included a duration clause that specifically limited the employer's commitment to provide health benefits.  See Pl.'s Br. Supp. Summ. J. Against USWA Defs. App. 2, col 3.  The language of the clauses varied slightly, but the clauses were substantially identical to the following clause from the 2001 CBA between Rexam and the USWA:

> Notwithstanding any other provisions of this Agreement, Article XXI, Insurance Plan shall remain in effect until and including May 31, 2004.  However, any changes in the Insurance Plan negotiated prior to February 23, 2004 shall be effective subsequent to May 31, 2004.

*Id*. at col. 3, row 12.

This duration clause is powerful evidence of non-vesting.  The clause begins with the words "[n]otwithstanding any other provisions of this Agreement," making it clear that the clause supersedes everything else in the CBA — including any other clause which might be interpreted to provide evidence of vesting.  The clause goes on to cite the article of the CBA in which the employer commits to provide health benefits.  And then the clause concludes by stating that that commitment is "in effect" until a particular date.  When the agreement, on its face, provides that the employer's commitment to provide health benefits expires on a date certain, and when that provision explicitly supersedes "any other provisions" of the agreement, then it is about as clear as can be that the health benefits are not vested.

It would be a struggle to find ambiguity in this duration clause.  One could argue, for example, that the clause merely provides that the employer's commitment to provide health benefits "shall remain in effect until and including May 31, 2004."  This is ambiguous, one could argue, because the clause does not say that the commitment remains in effect "only" until May 31, 2004, or that the commitment "ends" on May 31, 2004.  In other words, while the clause clearly commits the employer to provide health benefits until May 31, 2004, it is silent about what happens after that date.  Hence ambiguity, and hence the need to consult extrinsic evidence.

This would be a wholly implausible reading of the duration clause.  One need only consider the fact that many of the CBAs include general duration clauses that are applicable to

the CBAs as a whole and that use the exact same "shall remain in effect until and including" language that is found in the specific duration clauses that are applicable to the commitments to provide health benefits.  No one can seriously contend that the CBAs extended beyond the dates identified in the general duration clauses.  For the same reason, no one can seriously contend that the commitments to provide health benefits extended beyond the dates identified in the specific duration clauses.  CBAs, like other contracts, must be interpreted as a consistent whole.  *See Anderson*, 836 F.2d at 1519.  There is no reason why the "shall remain in effect until and including" language should mean one thing in the general duration clauses but something entirely different in the specific duration clauses.

The Eighth Circuit has advised employers who are  "'adamant against assuming perpetual obligations'" to "'eliminate all doubt by insisting on a clause that makes any entitlement to health benefits granted by the agreement expire on [a specific date].'"  *Morrell*, 37 F.3d at 1307 (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 609 (7th Cir. 1993)).  Rexam and its predecessors did just that.  Their decision must be respected, as "[i]t would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date."  *Anderson*, 836 F.2d at 1519; *see also Morrell*, 37 F.3d at 1307 (quoting *Anderson*).

In sum, the burden is on the USWA defendants to prove that retiree health benefits are vested.  The relevant documents contain express anti-vesting language in the form of duration clauses.  The same documents contain no express vesting language.  Because the documents are clear, the Court is not permitted to consider extrinsic evidence.  That would seem to be the end of the matter.

The USWA defendants have no real answer, except to point to isolated language in a few scattered documents that, in the view of the USWA defendants, provides at least ambiguous evidence of vesting.  The Court now turns to that language.

1. NCC USWA Subclass

The USWA defendants cite two things in arguing that members of the NCC USWA Subclass enjoy vested health benefits.  First, they rely on provisions in a 1981 CBA between NCC and the USWA that describe the health benefits that the company will provide *to the surviving spouses of active employees*.  In particular, the USWA defendants cite the following provisions of the 1981 CBA:

> [I]f on or after March 1, 1981, an active employee dies and leaves a surviving spouse, who is also eligible for the statutory preretirement surviving spouse benefits, such spouse shall be covered for life under the retired employees group insurance plan, in lieu of any other coverage. . . .

> Effective March 1, 1981.  The surviving spouse of an active employee who is eligible to receive the preretirement joint and survivor benefit will be covered as a dependent for his or her lifetime under the Retired Employees Group Insurance Plan.

Feinstein Aff. Ex. 22 at R004839-40, R004841.

Second, the USWA defendants rely on a February 16, 1981 Settlement Agreement.  That Settlement Agreement was essentially an agreement to agree — specifically, an agreement to enter into the 1981 CBA.  The Settlement Agreement outlined the major provisions that the negotiators had agreed would be contained in the 1981 CBA and committed "[t]he parties . . . to reduce to contract language their understandings and reproduce the same in a form appropriate for execution."  Feinstein Aff. Ex. 6 at R062394.  Judge Montgomery treated the Settlement Agreement as extrinsic evidence, and the USWA defendants did likewise at the June 19 hearing.

-21-

In their supplemental brief, though, the USWA defendants argue that the Settlement Agreement is intrinsic, rather than extrinsic, because the 1981 CBA incorporates it by reference.  Feinstein Aff. Ex. 22 at R004759.

The USWA defendants cite the following language in the Settlement Agreement, which appears under the heading "Retiree and Surviving Spouse Insurance":

a.   Surviving Spouse Coverage

The Agreement expands coverage for surviving spouses of active employees in two ways.  First, since active eligible employees will now automatically come under the pre-retirement joint and survivor provisions, their surviving spouses will be covered under the retiree insurance program for life.  The active employee's spouse who is not eligible for the joint and survivor benefit will continue to enjoy coverage under the active employee program for eight months after the employee dies; this compares to coverage which lasted at most two months under the old agreement.

b.   Retirees Married to Active Employees

The new Agreement classifies retired spouses of active employees as that employee's dependent, making the retiree eligible for the broader coverage afforded by the active employee's insurance program.

c.   Retirees' Post-Medicare Major Medical Program

Effective January 1, 1983, Company-paid major medical coverage will be provided for all retirees and surviving spouses of retirees (and dependents) who are eligible for Medicare.  Benefits will be the same as pre-Medicare retirees except the annual deductible will be $100 per person/$200 per family.  *These new benefits represent a significant expansion of the lifetime coverage available under the retiree's insurance program.*

Feinstein Aff. Ex. 6 at R. 062424 (emphasis added).

Addressing the USWA defendants' arguments in turn:  The language from the 1981 CBA — along with paragraph (a) of the language from the Settlement Agreement — do not refer to a single member of any subclass in this action.  Those subclasses are composed of retirees and

their spouses and surviving spouses.  The cited language refers to the surviving spouses of active employees.  It speaks volumes that the chief evidence relied on by the USWA defendants in arguing that retiree health benefits are vested is language that has nothing to do with retiree health benefits.

The USWA defendants insist, though, that it would make no sense for NCC to commit to provide vested health benefits to the surviving spouses of active employees, but not to provide vested health benefits to retirees.  Therefore, they say, NCC must have agreed at some point to vest retiree health benefits.  There are at least two problems with this argument:

First, the language cited by the USWA defendants does not even vest health benefits for the surviving spouses of active employees.  The language says, in slightly different ways, that the "surviving spouses will be covered for life under the retired employees group insurance plan."  The language obviously begs the question of what the retired employees group insurance plan will provide.  Read most naturally, the language says that, for the rest of their lives, the surviving spouses will get the same health benefits as retirees, but the language does not commit the company to *provide* health benefits to retirees.

Second, even if the language were read as the USWA defendants suggest, it would not be a vesting clause.  It would instead be evidence — weak evidence — that sometime prior to 1981 NCC agreed to vest retiree health benefits.  But indirect evidence that, in some other place and time, the employer may have made some kind of commitment to vest does not remotely approach the kind of evidence that a court would need to find that benefits had vested under Eighth Circuit precedent.  At best, what the USWA defendants cite is extrinsic evidence that

might be used to resolve an ambiguity in a vesting clause found in another, pre-1981 agreement — if only the USWA defendants could point to such a clause.

Similar points can be made about paragraph (c) of the excerpt from the Settlement Agreement. That paragraph at least relates to the health benefits of retirees. The USWA defendants rely in particular on the paragraph's final sentence, which provides: "These new benefits represent a significant expansion of the lifetime coverage available under the retiree's insurance program." According to the USWA defendants, the reference to "lifetime coverage" is evidence that the health benefits of retirees were vested.

Even accepting the USWA defendants' interpretation of the clause, the problem remains that the USWA defendants are citing an adjective, not a vesting clause. At best, they have spotted a clue that, at some point prior to 1981, NCC may have agreed to vest retiree health benefits. Again, though, where is that agreement? What exactly did it vest? Beginning exactly when?

The inadequacy of this proof becomes clear when one pauses to consider how this Court could draft an order granting judgment in *favor* of the USWA defendants. Suppose that, based on the evidence described above, this Court was prepared to impose on Rexam the burden of providing health benefits to the retirees for the rest of their lives. Where would this Court go to determine precisely what benefits Rexam had committed to provide? Are prescription drugs covered? How about eyeglasses? Are there co-pays? Limits on hospital stays? All that the USWA defendants have come up with is indirect evidence that, at some unspecified time before 1981, NCC made a promise to provide an unspecified level of health benefits to its retirees. How could this Court possibly enforce such a promise?

The bottom line is that, with respect to the NCC USWA Subclass, the USWA defendants are unable to point to a single sentence — clear or unclear — that vests health benefits for retirees.  At the same time, the 1981 CBA on which they rely includes a clear duration clause proving that NCC committed to provide health benefits only until May 31, 1984 — a duration clause that, by its terms, superseded everything else in the CBA, including the language cited by the USWA defendants.  Rexam is entitled to summary judgment with respect to the NCC USWA Subclass.

### 2.  ANC/USWA (Former NCC Plants) Pre-583 Subclass

In arguing that members of this subclass enjoy vested health benefits, the USWA defendants rely on the exact same "for life" and "lifetime" contractual language as they did for the NCC USWA Subclass.  Indeed, their briefing on this issue treats the two subclasses as one. The only difference between this subclass and the NCC USWA Subclass — and it is a substantial difference — is that this subclass relies on a reservation-of-rights clause found in the Buff Book (formally known as the "Retired Employees' Group Life Insurance and Health Care Plan for Retired Employees and Dependents, Effective January 1, 1974 and as amended effective September 1, 1987").  The clause provides as follows:

> American National Can expects to continue this Plan indefinitely, but necessarily reserves the right to amend, modify, or discontinue the Plan in the future in conformity with applicable legislation and also subject to any applicable collective bargaining agreement.

Pl.'s Br. Supp. Summ. J. Against USWA Defs. App. 7 at R012888.[4]

---

[4]Counsel for the USWA defendants have confirmed that their brief mistakenly cites to Feinstein Aff. Ex. 20 and that Appendix 7 to Rexam's original summary judgment memorandum, which was filed on September 15, 2005, is the "Buff Book."

With the exception of the phrase "and also subject to any applicable collective bargaining agreement," this clause is identical to an ACC reservation-of-rights clause that was examined by the Third Circuit in *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90 (3d Cir. 1992).  In *Alexander*, the Third Circuit found this reservation-of-rights clause to be ambiguous and reversed the district court's grant of summary judgment for the company.  *Id*. at 91.  The Third Circuit found that one possible meaning of this clause is that ANC agreed to continue the Plan forever, unless a change in the law forced the company to do otherwise.  The Third Circuit did not cite any other possible vesting language in a CBA or anywhere else, and thus the Third Circuit seemed to hold that an ambiguous reservation-of-rights clause, in and of itself, could provide sufficient intrinsic evidence to support a finding that the employer had agreed to vest health benefits for life.

*Alexander* does indeed support the position of the ANC/USWA (Former NCC Plants) Pre-583 Subclass.  The problem for the subclass is that *Alexander* is a Third Circuit case, and it approached the question of vesting in a manner that seems inconsistent with Eighth Circuit law. While the Eighth Circuit has "repeatedly held that an *unambiguous* reservation-of-rights provision is sufficient without more to *defeat* a claim that retirement welfare plan benefits are vested," *Stearns*, 297 F.3d at 712 (emphasis added), it does not follow that an *ambiguous* reservation-of-rights clause is sufficient, without more, to *establish* that retirement welfare plan benefits are vested — or even to open the door to extrinsic evidence on the question.

As discussed above, Eighth Circuit case law proceeds from the assumption that an employer would not lightly commit to provide vested health benefits.  Employers are presumed not to have done so.  The burden is on the employees to prove both that the employer agreed to

vest health benefits and that this agreement was "incorporated, in some fashion, into the formal written ERISA plan." *United Paperworkers*, 961 F.2d at 1386.  The Eighth Circuit has specifically instructed that district courts should be "reluctant to read more benefits into an ERISA plan than its plain language confers." *Morrell*, 37 F.3d at 1304.  And the Eighth Circuit regards "[t]he absence of any explicit vesting language" — an "absence" that did not trouble the *Alexander* court — as "strong evidence" that benefits are not vested. *Id.* at 1307.

All of this seems inconsistent with the notion that an ambiguous reservation-of-rights clause can provide all of the intrinsic evidence needed to find a commitment to vest health benefits.  True, the *Stearns* court observed that it is permissible to examine extrinsic evidence when a reservation-of-rights clause is facially ambiguous. *Stearns*, 297 F.3d at 712.  But *Stearns* relied on *Barker* and *Jensen* for that proposition.  In neither of those cases did the employees rely solely on an ambiguous reservation-of-rights clause; in both cases, the employees were able to point to other intrinsic evidence of vesting. *See Barker*, 122 F.3d at 635 (citing contractual language stating that "[w]hile on Long-Term Disability Status the company will pay the premiums for all the company-sponsored benefits . . . for which you and your defendants [sic] were enrolled before your disability began . . . until you and your dependents are no longer eligible for the plans"); *Jensen*, 38 F.3d at 950 (citing contractual language stating that benefits "*will* be provided until the retiree dies") (emphasis in original).  Here, by contrast, the USWA defendants can cite no similar vesting language.  In particular, they cannot point to any CBA or other document in which ANC actually agreed to vest — the agreement that is allegedly incorporated into the Plan through the ambiguous reservation-of-rights clause.

While the question is close, the Court concludes that the Eighth Circuit would not go as far as the Third Circuit in finding that an ambiguous reservation-of-rights clause, in and of itself, is sufficient to defeat summary judgment.  Rather, in light of all that is discussed above, and considering all of the governing documents that apply to the ANC/USWA (Former NCC Plants) Pre-583 Subclass (including the clear duration clauses and the other anti-vesting provisions in the CBAs), the Court concludes that the Eighth Circuit would find that this ambiguous reservation-of-rights clause provides too little intrinsic evidence of vesting to require the Court to consider extrinsic evidence.  The Court thus grants summary judgment to Rexam with respect to the ANC/USWA (Former NCC Plants) Pre-583 Subclass.

### 3.  Whitehouse Plant Subclass

ACC opened the Whitehouse, Ohio plant in the 1970s and negotiated separate, independent CBAs for that plant with the USWA.  USWA Defs.' Resp. to Rexam's Mot. Recons. 30.  Judge Montgomery stated that "[t]he parties have not identified any 'until death' or 'lifetime' language in any documents covering the Valparaiso Plant or Whitehouse Plant subclasses."  Mem. Op. and Order 22, Feb. 21, 2006.  At the June 19 hearing before the undersigned, the USWA defendants conceded that there is no vesting language in any document that applies to this subclass prior February 23, 2001, when the Whitehouse plant came under the Master CBA and the Red Book became the SPD applicable to that plant.  Hr'g Tr. 56, June 19,

2006.  In their supplemental brief, though, the USWA defendants changed their position.[5]  They

now cite two pre-Red Book provisions that they contend qualify as express vesting language.

The first is an eligibility provision from a 1986 SPD, which states: "Upon the death of a

retiree, coverage for spouses/dependent children will continue until the earlier of the date the

spouse dies, remarries or becomes eligible for Medicare."  Feinstein Supp. Aff. Ex. 14 at

R047398.  This falls short of providing even ambiguous evidence of vesting.

To begin with, although the language provides that, after the retiree dies, the spouse will

continue to be covered under the retiree health benefit plan, the language begs the question of

what that retiree health benefit plan will provide or even whether that retiree health benefit plan

will continue to exist.  The language does not commit the company to continue any particular

level of health benefits, much less commit the company to indefinitely sponsor a retiree health

benefit plan of some type.

More importantly, this language appears under the section heading "Eligibility for the

New Retiree Medical and Prescription Drug Plans."  Included in that section, and appearing

immediately before the language in question, the SPD states that "[c]overage ceases upon

attainment of eligibility for Medicare, regardless of age."  *Id.*  In other words, the SPD

unequivocally states that health benefits for a retiree cease when the retiree becomes eligible for

Medicare.  At most, the USWA defendants could argue that benefits under the 1986 plan are

vested until retirees and their spouses reach the age of Medicare eligibility.  But any such issue is

---

[5]The undersigned in no way implies that the USWA defendants acted improperly in
changing position.  This is an extremely complex case, and the undersigned gave the parties a
chance to submit supplemental briefs precisely because the undersigned recognized that no
attorney — even attorneys as knowledgeable and diligent as those representing the USWA
defendants — could keep track of all of the evidence in his or her head.

moot, because Rexam has provided unrebutted evidence that the four living USWA members

who retired under the 1986 plan range in age from 80 to 89, and thus have long been eligible for

Medicare.  Gibson Aff. ¶ 8.

The second pre-Red Book provision the USWA defendants cite appears in a 1989 SPD.

It states:

> The Employer intends to continue The Plan indefinitely but reserves the right to
> end or amend it.  Any such action would be taken only after carefully [sic]
> consideration and subject to the provision of any applicable collective bargaining
> agreement.

Feinstein Supp. Aff. Ex. 15 at R027654.  The USWA defendants argue that this clause protects

retiree benefits because "it clearly required that any reduction or modification of benefits could

only be taken after negotiating with the union."  USWA Defs.' Resp. to Rexam's Mot. Recons.

31.  But the clause does no such thing.  To the contrary, the clause explicitly gives ANC the right

to end or amend the plan, so long as such ending or amending does not violate a CBA — i.e., so

long as ANC has not agreed to vest benefits in a CBA.

The USWA defendants have not identified anything in any CBA that would limit ANC's

right to end or amend the 1989 Plan.  Rexam is therefore entitled to summary judgment with

respect to those members of the Whitehouse Plant Subclass who retired before February 23,

2001, when, according to the USWA defendants, the Red Book became applicable to

Whitehouse retirees.  USWA Defs.' Resp. to Rexam's Mot. Recons. 32; *see also* Feinstein Supp.

Aff. Ex. 17 at R005338 (February 23, 2001 Master Agreement between Rexam and USWA);

Barratt Dep. 182; Mem. Op. and Order 20 n.14, Feb. 21, 2006.

That leaves the members of the Whitehouse Plant Subclass who retired under the Red

Book.  Judge Montgomery found that the following provision in the Red Book created enough

ambiguity about whether benefits for these retirees were vested to entitle them to introduce extrinsic evidence:

> When Your Insurance Ceases.  Your medical expense benefits discontinue upon your death.  Your death will not affect the continuance of benefits for your spouse and your dependent children.  Any coverage continued after your death will, however, terminate upon remarriage or the death of your spouse.

Mem. Op. and Order 20-22, Feb. 21, 2006.  Rexam does not discuss this language, nor does it address Judge Montgomery's conclusion that this language became applicable to Whitehouse retirees in 2001.  Consequently, the undersigned sees no reason to disturb Judge Montgomery's conclusions with respect to Whitehouse workers who retired under the Red Book.  Rexam is not entitled to summary judgment with respect to those members of the Whitehouse Plant Subclass who retired on or after February 23, 2001.

### 4.  Valparaiso Plant Subclass

Again, Judge Montgomery found with respect to the Valparaiso plant, as with respect to the Whitehouse plant, that "[t]he parties have not identified any 'until death' or 'lifetime' language in any documents covering the . . . subclass[]."  Mem. Op. and Order 22.  And again, at the June 19 hearing before the undersigned, the USWA defendants conceded that there is no vesting language in any document that applies to the Valparaiso Subclass.  Hr'g Tr. 58, June 19, 2006.  Nevertheless, in an effort to defeat summary judgment, the USWA defendants now gamely cite language from a 1984 SPD.  This SPD describes health benefits

> for you, your surviving spouse and your eligible dependents.  You and your dependents are eligible for benefits under the Program if you have retired on a

pension (except a deferred vested pension) or if you are receiving a surviving
spouse pension under the National Can Corporation Wanatah[6] Pension Plan.

Feinstein Supp. Aff. Ex. 20 at R056567.  The USWA defendants emphasize the "surviving

spouse" language, but they do not attempt to explain why this would vest lifetime medical

benefits, and no such explanation occurs to the Court.

The USWA defendants also note that Judge Montgomery denied summary judgment with

respect to the Valparaiso Subclass based on language from the 1984 SPD setting a "maximum

lifetime limit of $100,000 for all covered medical expenses."  Mem. Op. and Order 22, Feb. 21,

2006.  With all respect to Judge Montgomery, the undersigned is not convinced that this

language is sufficient to block summary judgment.  Lifetime ceilings are commonly found in

health insurance plans, whether vested or not.  The undersigned himself has been covered by

various health insurance plans that were not vested but that contained lifetime ceilings.  A

lifetime ceiling on medical benefits is not a promise to pay medical benefits throughout a

lifetime.  It is, instead, a limit on a company's liability, expressed in the most absolute terms.  It

is a way of saying that under no circumstances will a plan — whether vested or not — be

required to pay more than a stated amount to a beneficiary.

The USWA defendants can point to no provision of any CBA, Plan, or SPD that provides

even ambiguous evidence of the vesting of health benefits for workers who retired from the

Valparaiso plant.  The Court thus grants summary judgment to Rexam with respect to the

Valparaiso Plant Subclass.

---

[6]The Valparaiso plant was formerly located in Wanatah, Indiana.  USWA Defs.' Resp. to
Rexam's Mot. Recons. 33.

5.  USWA 583 Plan Subclass

The USWA 583 Plan Subclass is composed of both former NCC employees and former ACC employees.  The former ACC employees are in a stronger position than the former NCC employees.  As Judge Montgomery found, ACC documents generally include vesting language that is stronger than the alleged vesting language found in NCC documents.  Mem. Op. and Order 21, Feb. 21, 2006.  For that reason, the undersigned did not give Rexam permission to move for reconsideration with respect to this subclass.  On reflection, though, it appears to the Court that Rexam may be entitled to summary judgment with respect to the former NCC employees within this subclass.  Those former NCC employees rely on the same evidence that the Court has already found to be insufficient to avoid summary judgment.

Because Rexam has not actually moved for reconsideration with respect to this subclass, and because the Court wants to tread carefully in this extremely complicated case, the Court will not at this time grant summary judgment with respect to the former NCC employees in this subclass.  Instead, the Court will order the USWA defendants to show cause why summary judgment should not be granted with respect to those subclass members.  In responding to that show-cause order, the parties should not revisit the issues that the Court has already decided.  Rather, the parties should address only the question whether Rexam is entitled to summary judgment with respect to the former NCC employees who are members of the USWA 583 Plan Subclass in light of this Memorandum Opinion and Order.  To avoid entry of summary judgment, the USWA defendants must identify vesting language that has not already been considered.  If they are unable to do so, summary judgment will be entered for Rexam.

### D.  The USWA Defendants' Motion for a Preliminary Injunction

Rexam terminated medical and prescription drug benefits for all of its Medicare-eligible retirees on January 1, 2006.  The USWA defendants move for a preliminary injunction requiring Rexam to restore those benefits.

The Court has already decided to grant Rexam's motion for summary judgment with respect to the NCC USWA Subclass, the ANC USWA (Former NCC Plants) Pre-583 Plan Subclass, and the Valparaiso Plant Subclass.  Obviously, the USWA defendants' motion for a preliminary injunction with respect to those subclasses will be denied.  In addition, the Court has already decided to grant Rexam's motion for summary judgment with respect to the members of the Whitehouse Plant Subclass who retired before February 23, 2001, and the Court has suggested that Rexam may be entitled to summary judgment with respect to the former NCC employees who are within the USWA 583 Plan Subclass.  The motion for a preliminary injunction will therefore be denied with respect to those subclass members.  *See Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 84 (8th Cir. 1995) (stating that, if a party cannot withstand a motion for summary judgment, it is impossible to conclude that the party is likely to succeed on the merits).

That leaves the members of the Whitehouse Subclass who retired on or after February 23, 2001, and the former ACC employees who are within the USWA 583 Plan Subclass.  At this point, it is very difficult for the Court to evaluate whether a preliminary injunction would be appropriate for these subclass members.  The Court does not know how many members of the USWA 583 Plan Subclass are former ACC employees, nor what kind of irreparable harm they claim to be suffering.  The USWA defendants have provided only one sworn statement from a

-34-

member of this subclass relevant to the issue of irreparable harm, and that member's declaration does not indicate whether he is a former ACC employee or a former NCC employee.  *See* Allen Decl. ¶ 3.  Similarly, the USWA defendants have provided only one sworn statement from a Whitehouse class member, and it appears that that member retired in 1988, well before the adoption of the Red Book.  Collins Decl. ¶ 3.

The Court acknowledges that these omissions are likely due to the fact that, until now, the parties were dealing with five separate subclasses and widely varying contract language. Now that the parties have assisted the Court in narrowing and clarifying the issues remaining in this case, it is possible that the remaining subclass members could prevail on a motion for a preliminary injunction.  The Court will therefore deny the USWA defendants' motion for a preliminary injunction without prejudice.  The USWA defendants may renew that motion if they are so inclined.  Needless to say, if the USWA defendants renew the motion, their briefs and affidavits should be directed specifically to the subclass members whose claims have not been dismissed.

The Court encourages the USWA defendants to give careful thought to what they might accomplish by renewing their motion for a preliminary injunction and whether that potential benefit justifies the time and expense that would be devoted to bringing such a motion.  This case will be placed on the undersigned's trial calendar and will likely be tried this winter.  The remaining claims can probably be tried in about the time that it would take the parties to notice, brief, and argue — and this Court to dispose of — another motion for a preliminary injunction.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.  Plaintiff Rexam's motion for reconsideration [Docket No. 316] is GRANTED in part and DENIED in part, as follows:

a.  Rexam's motion for reconsideration is GRANTED with respect to the NCC USWA Subclass, the ANC USWA (Former NCC Plants) Pre-583 Plan Subclass, the Valparaiso Plant Subclass, and the members of the Whitehouse Plant Subclass who retired before February 23, 2001.

b.  Rexam's motion for reconsideration is DENIED with respect to the members of the Whitehouse Plant Subclass who retired on or after February 23, 2001.

2.  The portions of the Court's Memorandum Opinion and Order dated February 21, 2006 [Docket No. 250] denying Rexam's motion for summary judgment with respect to the members of the subclasses identified in paragraph 1(a) of this Order are VACATED, and Rexam's motion for summary judgment [Docket No. 193] is GRANTED with respect to the members of those subclasses.

3.  The counterclaims of the members of the subclasses identified in paragraph 1(a) of this Order [Counts I and II of Docket No. 48] are DISMISSED WITH PREJUDICE AND ON THE MERITS.

4.  The Court hereby DECLARES that Rexam has the right unilaterally to amend, modify, or terminate the retiree health benefits provided to the members of the subclasses identified in paragraph 1(a) of this Order.

5.  The USWA defendants' motion for a preliminary injunction [Docket No. 254] is DENIED WITH PREJUDICE AND ON THE MERITS with respect to the members of the subclasses identified in paragraph 1(a) of this Order and DENIED WITHOUT PREJUDICE in all other respects.

6.  The USWA defendants are ORDERED TO SHOW CAUSE why summary judgment should not be granted with respect to the non-ACC members of the USWA 583 Plan Subclass within 30 days of the date of this Order.

Dated:  August   31,  2006                    s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge