UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| REXAM INC., | Case No. 03-CV-2998 (PJS/JJG) |
| Plaintiff, | |
| v. | |
| UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC; and PAUL BAKER, WALDO W. SLAGERMAN, MARLENE A. RUDOLPH, STEVEN J. STOLARSKI, GEORGE A. KNEIFEL, GAIL J. REARICK, DWAYNE L. WILSON, MARTHA K. YANOSH, and GREGORY G. GEORGE, individually, and as representatives of persons similarly situated, | ORDER APPROVING SETTLEMENT FOR THE NCC CLASS |
| Defendants. | |

Alton L. Gwaltney, III, MOORE & VAN ALLEN; and Timothy E. Branson, DORSEY & WHITNEY LLP, for plaintiff.

William T. Payne, STEMBER FEINSTEIN DOYLE & PAYNE, for the NCC Class defendants.

This matter is before the Court on the parties' joint motion, pursuant to Fed. R. Civ. P. 23(e), for approval of a settlement between plaintiff Rexam Inc. ("Rexam") and the NCC Class. For the reasons set forth below, the motion is granted.

I.  BACKGROUND

This hard-fought case presented the question of whether Rexam, a can manufacturing company, has the right to modify or discontinue the health and life insurance benefits of its union retirees. After extensive discovery and significant motions practice, the Court and the parties grouped the retirees into

subclasses according to the contractual and health-plan language applicable to each group.  One of those subclasses is the NCC Class, which (as modified for purposes of settlement) is defined as:

    (a)    Retirees who –

        (1)    worked for Rexam, American National Can Company, or National Can Company at a can manufacturing plant that was originally owned and operated by National Can Company;

        (2)    were represented by the USW at the time of their retirement;

        (3)    were eligible to receive retiree health benefits at the time of their retirement; and

        (4)    retired on or before February 24, 2007.

    (b)    Retirees who –

        (1)    worked for the Rexam can manufacturing plant in Valparaiso, Indiana or Wanatah, Indiana once owned by National Can Company;

        (2)    were represented by the USW (or its predecessor the Aluminum, Brick and Glass Workers Union) at the time of their retirement;

        (3)    were eligible to receive retiree health benefits at the time of their retirement; and

        (4)    retired or will retire on or before September 20, 2008.

    (c)    Retirees who –

        (1)    worked for the Rexam can manufacturing plant in Whitehouse, Ohio;

        (2)    were represented by the USW at the time of their retirement;

        (3)    were eligible to receive retiree health benefits at the time of their retirement; and

        (4)    retired on or before February 22, 2001.

  (d)    Current spouses and surviving spouses of the retirees described in section (a), (b), or (c), if those spouses were married to said retirees when the retirees retired, and if the spouses have not remarried since the death (if any) of the retirees.

Docket No. 366 at 2-3. According to the parties, there are approximately 2,551 members of the NCC Class.

Last year, the Court granted Rexam's motion for summary judgment with respect to members of the NCC Class and declared that Rexam has the unilateral right to amend, modify, or terminate the retiree health benefits provided to the NCC Class.[1] In January 2007, the parties engaged in private mediation and reached a settlement. NCC Class representatives, as well as a health-care consultant retained by the settling class, participated in the mediation.

In brief summary, the proposed settlement establishes a two-tiered system, based on whether a class member is eligible for Medicare. Class members who are not yet eligible for Medicare are guaranteed the right to participate in Rexam's basic pre-Medicare retiree medical PPO plan until they become eligible for Medicare (unless a substantially equivalent government-sponsored health-care plan becomes available). These class members will receive an annual credit of $2,500 toward the premium for coverage under the PPO plan. The pre-Medicare class members' benefits are not vested, but Rexam may only modify their benefits if the modifications are made on a uniform basis for all participants in the plan. In addition, for the purpose of calculating the maximum benefits payable under

---

[1] The NCC class was originally splintered into a number of smaller subclasses, and the Court granted Rexam's motion with respect to each of the subclasses comprising the NCC Class in separate orders. *See* Docket No. 328 at 36-37; Docket No. 333; Docket No. 341; Docket No. 348.

the plan, the pre-Medicare class members' amount of benefits received will be reset to zero dollars. Dependent children of both pre-Medicare and Medicare-eligible class members are eligible for coverage under the same plan, as long as the class member seeking such coverage pays all costs, including the annual premium and any deductibles.

For class members who are or who become eligible for Medicare, Rexam will pay a monthly stipend of $44.58. This stipend is vested. In addition, the settlement provides a vested life-insurance benefit of $5,000.

After the Court entered an order preliminarily approving the settlement, the parties retained a professional claims administrator (Rust Consulting) to notify class members of the proposed settlement. Rust Consulting performed two address verification measures and mailed the notification. Class members were notified of the terms of the settlement, of their right to object to it, and of their right to appear at the final fairness hearing. Each class member was also told whether he or she was currently eligible for Medicare. A number of class members filed objections and appeared at the hearing. Several class members submitted additional documents, such as CBAs and health-plan materials, to support their argument that the settlement is unfair because Rexam has no right to modify or terminate their benefits.

## II. ANALYSIS

### A. *Standard of Review*

Under Fed. R. Civ. P. 23(e), a court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class. A court may approve a class

settlement only after a hearing and on finding that the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(1)(C).

Before reaching the merits of the parties' motion, it is important to be clear about the question before this Court, as most of the objections to the settlement reflect some confusion on this point. The Court is not being asked the moral question of whether Rexam is treating its retirees reasonably. Rather, the Court is being asked the legal question of whether the proposed settlement a reasonable compromise of a legal dispute. The Court recognizes that many of the class members devoted decades of their lives to making Rexam the financially successful company that it is today, and the Court is certainly sympathetic — and has told Rexam that it is sympathetic — to the argument that Rexam is morally obligated to ensure that its retirees can receive adequate health care. But this Court does not ultimately sit in judgment of moral questions.

To address the legal question, the Court considers four factors: (1) the merits of the class's case, weighed against the terms of the settlement; (2) the opposing party's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the proposed settlement. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932-33 (8th Cir. 2005). In light of these factors, the Court finds that the proposed settlement is a fair, reasonable, and adequate settlement of the legal claims before the Court.

### B. The Merits of the Class's Case

The most important reason why the proposed settlement is fair, reasonable, and adequate is that the NCC Class has already lost its case before this Court. A year ago, the Court entered summary judgment against the NCC Class and declared that, as a legal matter, Rexam is free to modify or

terminate the NCC Class's health-care benefits at any time. True, the parties did not address, and the Court did not decide, the parties' dispute about the NCC Class's right to life-insurance benefits. That is so, however, because (as class counsel concede) the NCC Class members' strongest claim for vested benefits was with respect to their health benefits. Class counsel do not dispute that if the NCC Class members' health benefits were not vested, then their life-insurance benefits were also not vested.

The basis of the Court's decision was straightforward. An employer is not legally obligated to pay health-care benefits for life unless it agreed to do so in a writing that is a part of or incorporated into a formal written benefit plan. The employees (or, in this case, the retirees) have the burden of proving the existence of such a written agreement. The Court and the parties have looked at every CBA and benefit plan between Rexam and the NCC Class. In not one of those documents is there a single sentence expressing an explicit commitment to vest health-care benefits. According to the United States Court of Appeals for the Eighth Circuit, which hears appeals from this Court and whose decisions bind this Court, that lack of explicit vesting language is "strong evidence" of nonvesting. *John Morrell & Co. v. United Food and Commercial Workers Int'l Union*, 37 F.3d 1302, 1307 (8th Cir. 1994).

Equally as important, the CBAs and plans contain many clauses — such as continuation clauses, coordination-of-benefits clauses, and, especially, duration clauses — that pretty clearly reflect that Rexam did *not* agreed to vest health-care benefits.[2] According to the Eighth Circuit, these clauses

---

[2] Objector Charles Turner contended that the duration clause cited in the Court's August 31, 2006 opinion does not appear in the contracts applicable to the NCC Class. Mr. Turner is mistaken; the language that the Court cited does indeed appear in the contracts that Mr. Turner submitted to the Court. *See* Docket No. 407 Ex. A at 75; *id.* Ex. B at 75.

are also strong evidence of nonvesting. In light of the absence of any express vesting language in any CBA or plan, and in light of the substantial evidence of nonvesting, the Court concluded that no reasonable jury could find that Rexam promised to vest the health-care benefits of the NCC Class.

Nothing in any communication or filing from any objector calls the Court's decision into question. Although many argue that Rexam promised to vest benefits and is now breaking its word, not one objector points to a written promise to vest benefits that is part of or has been incorporated into a formal written benefit plan. Nor does any objector try to reconcile the existence of such a promise with the duration and other clauses that do appear in the CBAs and plans. Indeed, some of the objectors' newly filed documents provide further evidence of *non*vesting: For example, a February 22, 1993 letter from J.M. Schemm, a vice president of American National Can Company, to the USW describes the establishment of a committee to study health benefits and recommend changes. As the Eighth Circuit has observed, the periodic negotiation and modification of health benefits seriously undermines any claim of vesting. *See John Morrell & Co.*, 37 F.3d at 1307 ("[T]he fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested.").

Another example of nonvesting language appears in the November 2004 binder entitled "Benefits: Framework for the Future." (Rexam evidently distributed the binder to its retirees.) A copy of this binder was provided to the Court at the fairness hearing. On page 36, under the heading "Plan Changes and Termination," the binder states: "The Company reserves the right to amend, modify or terminate the plan, in whole or in part, or any benefits provided under the plan for any or no reason, subject to the terms of the Collective Bargaining Agreement covering current active employees during

the term of such Agreement." Similarly, the Summary Plan Description for the Rexam medical plan, found in the same binder, contains the same reservation-of-rights clause on page 35.[3] The Eighth Circuit has "repeatedly held that an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested." *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002).

      The bottom line is that the NCC Class has already lost. This Court has already decided, on the basis of the evidence described above, that Rexam has the legal right to terminate the health-care benefits of the NCC Class — that is, to leave class members with nothing. The NCC Class had the right to appeal this decision, but the NCC Class was unlikely to win on appeal. Moreover, in the unlikely event that the NCC Class won on appeal, it was unlikely to win at trial. The Court recognizes that the settlement imposes a substantial cost on non-Medicare-eligible members of the NCC Class, in the form of premiums for health-care coverage that are so high (the 2007 premiums will be over $400 per month, or $800 per month for a couple) that, in many instances, non-Medicare-eligible class members may not be able to afford to purchase coverage under Rexam's plan. The Court is sympathetic to the plight of these class members — and the Court understands why some class members regard the monthly stipend for Medicare-eligible members and the $5,000 in life-insurance benefits as paltry in light of what they expected to receive after retirement. But the reasonableness of the settlement must be viewed not in light of what the retirees hoped to receive, but in light of what they

---

[3]The binder is not consecutively paginated. The Court is referring to the first page 36, behind the tab labeled "Medical," and to the second page 35, also behind the "Medical" tab, but separated from the first section by a blue-colored page.

were likely to receive after this litigation. Given that the NCC Class was virtually certain to end up with nothing, the proposed settlement is reasonable. *See DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1177 (8th Cir. 1995) ("virtually any benefit inuring to the class would be better than the prospect of an ultimately unsuccessful litigation").

### C. Rexam's Financial Condition

There is no dispute that Rexam is fully capable of meeting its obligations under the proposed settlement. This factor therefore weighs in favor of approval.

### D. The Complexity and Expense of Further Litigation

As noted, the NCC Class has already lost in this Court. The NCC Class's only alternative to settlement, therefore, is to appeal the Court's orders granting summary judgment to Rexam. There is little chance that the NCC Class would succeed in that appeal. Statistically speaking, reversals are uncommon, and no objector has given the Court any reason to believe that reversal is likely in this particular case. Even if the NCC Class prevailed on appeal, that would not mean that the NCC Class would be entitled to benefits; it would simply mean that the NCC class would be entitled to a trial on whether their health-care benefits were vested. Such a trial, which would take place at the earliest in mid-2009 (in other words, after the appeal), would be very long and expensive. The parties would introduce hundreds — perhaps thousands — of pages of intrinsic evidence. The parties would also introduce a great deal of extrinsic evidence in the form of testimony from various union and Rexam officials. If the NCC Class prevailed at trial, Rexam would undoubtedly bring a round of post-trial motions, which would most likely not be ruled on until late 2009. Assuming that the NCC Class prevailed on post-trial motions (that is, that the Court did not order a new trial or enter judgment for

Rexam), Rexam would assuredly appeal, in which case the parties could expect to wait until early 2011 for a final decision in a case that is already over four years old.

Lengthy litigation is hard on any party, but it is particularly hard on a class that mostly consists of Medicare-eligible people in their 60s and 70s. These Medicare-eligible class members will not receive any health-care benefits during the course of the litigation. The best-case scenario for them (as for the non-Medicare-eligible class members) would be a win in early 2011, and the class has almost no chance of achieving that best-case scenario. The complexity and expense of further litigation in this case weighs in favor of approving the settlement.

### E. Opposition to the Settlement

As noted above, class members were given the opportunity to submit written objections to the proposed settlement. In addition, class members were invited to appear at the fairness hearing. Of the 2,551 class members, forty submitted written objections and seventy-one signed one of two petitions opposing the settlement. Accounting for class members who both signed the petition and submitted an objection, the parties calculate that 103 class members either submitted an individual objection or signed a petition, which amounts to just over four percent of the NCC Class.

To put this number into perspective, it is important to remember that this is not a small-stakes settlement in which, say, class members are being offered a $10 coupon in exchange for giving up small individual claims of which they were probably unaware. To the contrary, this settlement calls for a large reduction in health-care and life-insurance benefits for retirees on fixed incomes, many of whom can expect to experience significant hardship as a result. Given that it would not be surprising for a settlement of this kind to produce an avalanche of objections, the actual number of objectors is

relatively small. Moreover, the majority of the objectors signed one of two petitions; only 40 out of 2,551 — that is, 1.6% — submitted individual objections.

The nature of these objections is as important as the number. Thirty-four objectors were signatories to a petition sponsored by the retirees of one plant — the now-closed Houston plant — accusing the USW and Rexam of a conspiracy to deprive them of their benefits in exchange for better benefits for future Rexam retirees. There is no evidence whatsoever to support this accusation, and it is contradicted by everything the Court has witnessed. The USW has already paid $500,000 in legal fees to defend current Rexam retirees from Rexam's lawsuit. The attorneys that the USW hired have tirelessly and skillfully worked to prove that the NCC Class's health benefits are vested. Class counsel participated in four years' worth of discovery and motions practice, and they have diligently searched through thousands of pages of documents to identify contractual language supporting the retirees' claims. The USW and class counsel reached the proposed settlement for the NCC Class only *after* the NCC Class had lost its case in this Court. The fact that the ACC Class — which was in a better position than the NCC Class (absent settlement, the ACC class was entitled to a trial) — received a more favorable settlement demonstrates that the USW and class counsel fought as hard as they could to obtain the most favorable settlement possible for each subclass.[4]

---

[4]In light of the complete lack of any evidence of a conspiracy — and the abundance of evidence of the absence of a conspiracy — the Court denies the petitioners' request that it delay ruling for six months to allow them to obtain evidence supporting their allegations. *Cf. DeBoer*, 64 F.3d at 1178 ("Having adduced no evidence of collusion other than their complaints as to the settlement terms, the [objectors] have failed to raise an inference of bad faith in the negotiation process.").

Other objectors point out that the class members worked hard to help make Rexam the profitable company that it is today and therefore deserve better from Rexam. The Court does not disagree. But, as explained above, that is not the question before the Court, which is required to focus only on the question of whether the proposed settlement is reasonable in light of the strength of the class members' legal claims.

Many objectors, especially the pre-Medicare-eligible objectors, also argue that they will suffer serious hardship as a result of the settlement. Again, the Court does not disagree. But, as the Court has already explained, the most likely alternative to this settlement is years of litigation followed by no benefits whatsoever for any of the class members. Something is better than nothing.

A number of objectors argue that either class counsel or the class representatives did a poor job of representing the NCC Class's interests. These objectors are simply wrong. As noted, class counsel has tenaciously and skillfully litigated this case, and the class representatives have taken their responsibilities very seriously. No doubt, class counsel and the class representatives are no more pleased with the settlement than the objectors, but they had to play the cards they were dealt. They negotiated the best settlement they could on behalf of a class that had already lost in court and that was unlikely to succeed on appeal.

Finally, a number of objectors have asked to opt out of the settlement. The Court denies these requests for two reasons. First, the NCC Class was certified under Fed. R. Civ. P. 23(b)(1)(A) and (b)(2), and it is not clear that the Court has the authority to permit class members to opt out of such a class. *See DeBoer*, 64 F.3d at 1175 ("'the privilege to opt-out of the action should be operable only when the class action is maintainable under [Rule 23(b)(3)] alone'" (alteration in original)) (quoting 7A

Charles A. Wright et al., *Federal Practice and Procedure* § 1777, at 521 (1986)); *In re Fed. Skywalk Cases*, 680 F.2d 1175, 1178 n.7 (8th Cir. 1982) ("Class members in a 23(b)(3) class are free to 'opt out' while, under the majority rule, class members in a 23(b)(1)(A) or 23(b)(1)(B) class cannot 'opt out.'").

Second, even if the Court had such authority, it would decline to permit class members to opt out. Class members who chose to opt out would not be entitled to keep their benefits. Instead, they would have to file a separate lawsuit, pursue years of complex and expensive litigation, win the right to a trial, win that trial, and then win an appeal after that trial — and they would have to do all of this without the financial backing of the USW. After four years of discovery and a half million dollars in (below-market-price) attorney's fees, the USW and class counsel were unable to prove the NCC Class's case. The Court finds it extraordinarily unlikely that any individual class member paying his or her own legal fees would fare any better or obtain a more favorable settlement. Permitting individual class members to opt out would also (in all likelihood) scuttle the entire settlement and thereby result in the non-objecting class members — who are the vast majority of the class — being put in a worse position. The extreme odds against a class member getting a better result on his or her own cannot outweigh the non-objecting majority's interest in preserving the settlement. *See In re Wireless*, 396 F.3d at 933 (in considering whether to approve a settlement, "[t]he district court has a duty to the silent majority as well as the vocal minority").

After the parties notified 2,551 class members of their right to object, only four percent of those class members have come forward to oppose the settlement, and their objections do not persuade the

Court that the settlement is an unfair compromise of a disputed claim. The Court therefore finds that this factor weighs in favor of settlement.

### *F. Conclusion*

Having considered all the relevant factors, the Court finds the proposed settlement to be fair, reasonable, and adequate under Rule 23(e). The Court will therefore grant the parties' joint motion for approval and will enter the stipulated judgment proposed by the parties.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT the parties' joint motion for final approval of settlement for the NCC Class [Docket No. 396] is GRANTED. A separate judgment in the form proposed by the parties will be entered this day.

Dated: September 17, 2007         s/Patrick J. Schiltz
                                  Patrick J. Schiltz
                                  United States District Judge